David E. Leta (USB #1937)
Andrew V. Hardenbrook (Arizona Bar # 025518)
*Admitted pro hac vice*
**SNELL & WILMER L.L.P.**
15 W. South Temple, Suite 1200
Salt Lake City, UT 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
Email: dleta@swlaw.com

*Counsel for Federal Resources Corporation
and proposed counsel for Camp Bird Colorado, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **FEDERAL RESOURCES CORPORATION,** | Bankruptcy Case No. 14-33427 |
| | (Chapter 11) |
| Debtor. | Judge Joel T. Marker |

## MOTION FOR SUBSTANTIVE CONSOLIDATION OF DEBTORS' BANKRUPTCY ESTATES

Pursuant to Local Bankruptcy Rule 1015-1 and 11 U.S.C. § 105(a), Federal Resources Corporation and Camp Bird Colorado, Inc. (collectively, the "**Debtors**"), respectfully request that the Court enter an order substantively consolidating their respective bankruptcy estates under Case No. 14-33427 with the bankruptcy estate of Federal Resources Corporation ("**Federal**") as the remaining bankruptcy estate. Substantively consolidating Federal's bankruptcy estate with the bankruptcy estate of Camp Bird Colorado, Inc. ("**Camp Bird**") is appropriate because, among other things, similar issues and common creditors exist in both

cases, and substantive consolidation will ensure the equitable treatment of all creditors at the lowest cost.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**    **JURISDICTION**

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and this is a core proceeding under § 28 U.S.C. § 157(b)(2)(A) and (O).  Venue of the Motion is proper before this Court under 28 U.S.C. §§ 1408 and 1409 and Local Bankruptcy Rule 1015-1.  The statutory predicate for the relief requested herein is 11 U.S.C. § 105(a).

**II.**    **RELEVANT FACTUAL BACKGROUND**

**A.**    **FEDERAL RESOURCES CORPORATION**

*1.*    ***Federal's Assets and Business Operations***

Federal is a Nevada Corporation that was formed in 1960 as a result of a merger between Radorock Resources, Inc., and Federal Uranium Corporation.  Federal is a public company, with over 18,000 shareholders.  Approximately 56% of Federal is owned by Bentley J. Blum ("**Blum**"), an individual residing in Miami, Florida, and approximately 14% is owned by The Blum Family Trust ("**Blum Trust**"), an affiliate of Mr. Blum.  Federal is no longer a reporting company because it did not have the cash flow to pay for audited financial statements and has not been current in its filings since 1993.

Federal currently has only two assets: (1) 100% of the stock of Camp Bird, a Colorado corporation,[1] and (2) 100% interest in a Madawaska Mines Limited, a Canadian corporation doing business in Ontario Canada ("**Madawaska Mines**").[2]

---

[1]    On March 18, 2010, Debtor and the Blum Trust entered into a Share and Asset Transfer and Debt Assignment Agreement pursuant to which Debtor purportedly sold, assigned, transferred and set over unto the Blum Trust all of the issued and outstanding shares of capital stock of Camp Bird.  The same parties entered into a Rescission of Share and Asset Transfer and Debt Assignment Agreement dated as of July 23, 2014, which reversed the prior transaction in its entirety.

[2]    Madawaska Mines is not a debtor in bankruptcy.

Camp Bird's principal assets consist of patented gold mining claims and related land located in Ouray, Colorado ("**Camp Bird Properties**"). Camp Bird also is the sole owner of Camp Bird Tunnel, Mining and Transportation Company ("**CTMT**"), which owns various water and tunnel rights used and associated with the Camp Bird Properties.

Madawaska Mines owns a 51% interest in a joint venture, which holds the Madawaska Mine near Bancroft, Ontario. The value of the Federal's interest in this company is unknown.

From 1955 to 1982, Federal principally engaged in the business of acquiring, exploring and developing mining properties located in the United States and Canada, including uranium, lead, zinc, gold, silver, copper, and coal properties. Due to adverse market conditions that made its mining operations unprofitable, Federal substantially curtailed all such operations in 1982.

As a result of certain acquisitions made in 1986, 1987 and 1988, between 1982 and 1989 Federal operated in four principal business segments: natural resources, light industrial manufacturing, retail operations and furniture manufacturing.

On August 14, 1986, Camp Bird entered into a lease and option to purchase agreement (the "**Lease and Purchase Option**") with Chipeta Mining Corporation, Royal Gold, Inc., and Ouray Ventures, Inc. (collectively "**Lessees**"). Pursuant to the terms of the Lease and Purchase Option, the Lessees took over operations of the Camp Bird Properties. They operated the property under the name Camp Bird Venture. On April 22, 1990, the Lessees terminated the Lease and Purchase Option related to the Camp Bird Properties, due to their inability to define mineable ore reserves at the Camp Bird Properties.

### 2.    *Employees of Federal's Former Subsidiary Defraud Federal*

In May 1989, it was determined that a material fraud had been perpetrated by certain officers and employees of Kenyon Home Furnishings, Ltd., a subsidiary acquired by Federal in April 1988 ("**Kenyon Subsidiary**"). As a result of this fraud, Federal spent considerable funds for legal fees to defend itself from various claims because of the fraud.

Since the implosion of Federal from the fraud committed in the Kenyon Subsidiary, Debtor has not been engaged in any active mining, or other business operations. Federal has been actively attempting to find a buyer for the Camp Bird Properties or to otherwise monetize Camp Bird's assets. Several sales agreements have been entered into, but none has closed yet. As of the Petition Date, Federal's business is as holding company for the stock and interest identified above.

B.     **CAMP BIRD COLORADO, INC.**

1.     *Camp Bird's Assets and Historical Business Operations*

Camp Bird is a Colorado corporation formed in 1958. Camp Bird is a wholly owned subsidiary of Federal. Camp Bird's principal assets consist of the Camp Bird Properties. Camp Bird also is the sole owner of CTMT, which owns various water rights and tunnel rights used and associated with the Camp Bird Properties.[3] Between 1963 and 1982, Camp Bird conducted gold mining and extraction activities on the Camp Bird Properties, but since 1986, Camp Bird has not been actively engaged in mining.

2.     *The Caldera Agreement*

In 2012, Camp Bird entered into various agreements with Caldera Mineral Resources, LLC ("**Caldera**") and with Caldera Holdings, LLC ("**Caldera Holdings**"), an affiliate of Caldera. These agreements included a Deed of Trust in favor of Caldera Holdings, a Joint Venture Agreement between Camp Bird and Caldera, and various ancillary agreements including a Lease and Option Agreement.[4]

In essence, these agreements contemplated an initial expenditure by Caldera for the purpose of exploring mining opportunities on the Camp Bird Properties, followed by a more

---

[3]     CTMT is not a debtor in a bankruptcy.

[4]     Camp Bird and Federal reserve any and all of their rights to contest, among other things, the validity of any agreement between Camp Bird and Caldera and Caldera holdings as well as any liens and encumbrances claim by Caldera and Caldera Holdings in Camp Bird's assets.

extensive investment pursuant to an option contained within the Lease and Option Agreement. The initial expenditure was made, and the option was exercised, but Caldera failed to close and remit the required payment. As a result of this breach, Camp Bird has substantial claims against Caldera, and against Caldera Holdings, which it intends to pursue and resolve during this bankruptcy case.

### C.   THE IDAHO LAWSUIT

In 2011, the United States of America, Department of Agriculture, commenced the Idaho Lawsuit against Federal, Camp Bird, Mr. Blum, and the Blum Trust, entitled *United States of America v. Federal Resources Corporation*, et al., Civil No. 2:11-cv-00127-RCT, United States District Court for the District of Idaho (the "**Idaho Lawsuit**"). At its core, the Idaho Lawsuit sought the recovery of funds incurred by the United States pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), for environmental cleanup efforts at the Conjecture Mine site in Bonner County, Idaho and at the Minnie Moore Mine site in Blaine County, Idaho.

Although the Government alleged that only Federal conducted mining operation on the Conjecture Mine site and Minnie Moore Mine site (and not Camp Bird, Mr. Blum or the Blum Trust), the Government asserted that Camp Bird and Mr. Blum were liable as the alleged alter egos of Federal. The Government also asserted a claim for fraudulent transfer under 28 U.S.C. § 3304 against Federal, Camp Bird, and the Blum Trust related to a March 2010 Share and Asset Transfer and Debt Assignment Agreement, pursuant to which Federal purportedly sold, assigned, transferred and set over unto the Blum Trust all of the issued and outstanding shares of capital stock of Camp Bird.[5] Federal also filed a counterclaim against the United States in this action, alleging contributory liability for a portion of the response costs.

---

[5]   As set forth herein, Federal and the Blum Trust entered into a Rescission of Share and Asset Transfer and Debt Assignment Agreement dated as of July 23, 2014, which reversed the prior transaction in its entirety.

On July 14, 2014, the Idaho District Court in the Idaho Lawsuit entered an order on several pending motions including, in particular, the Government's motion for summary judgment and Federal's motion for partial summary judgment. In its ruling, the Court granted the Government's motion for summary judgment and, among other things, (i) determined that Camp Bird and Mr. Blum are the alter egos of Federal, (ii) awarded the Government $3,653,362.52 in cleanup costs and $54,546.22 in accrued interest against all of the defendants to the Idaho Litigation, jointly and severally, with regard to the Conjecture mine site, (iii) awarded the Government $689,223.24 in cleanup costs and $9,208.68 in accrued interest, with regard to the Minnie Moore site, and (iv) granted the Governments' fraudulent transfer claim under 28 U.S.C. § 3304(A)(2). In the same ruling, the Idaho District Court also denied Federal's motion for partial summary judgment on Federal's counterclaim.

### D.    DEBTORS FILE FOR CHAPTER 11 RELIEF

On December 29, 2014 (the "**Petition Date**"), Federal and Camp Bird initiated their respective voluntary petitions for relief under Chapter 11.

Federal and Camp Bird have elected to seek relief under Chapter 11 for multiple reasons, including the avoidance of additional time, fees and costs associated with the Idaho Lawsuit, the opportunity to resolve, liquidate and pay whatever is properly owed to the Government in connection with the claims in the Idaho Lawsuit, and, most importantly, the opportunity to preserve and realize the value of Federal's principal asset, namely, its ownership interest in Camp Bird.

During this case, Federal anticipates accomplishing the foregoing objectives by: (a) substantively consolidating Federal and Camp Bird, with Federal being the surviving entity, (b) selling the assets of Camp Bird to the highest and best offer, free and clear of liens and encumbrances, with valid liens and claims to attach to the proceeds, and (c) distributing the proceeds of a sale to creditors and equity holders in accordance with their respective priorities.

Federal intends to accomplish its goals both through this motion for substantive consolidation as well as through confirmation of a liquidating plan of reorganization. In this way, Federal believes it can realize the highest and best value of its assets and, at the same time, repay its creditors in a timely manner.

### E.      EVENTS IN IDAHO LAWSUIT SINCE THE PETITION DATE

On the Petition Date, Federal and Camp Bird, respectively, filed notices of bankruptcy in the Idaho Lawsuit. On December 31, 2014, the Idaho Court held a telephonic hearing at the conclusion of which it requested the parties to provide further briefing by January 9, 2015 regarding, among other things, whether it could proceed with entering judgment in light of the Debtors' pending bankruptcy proceedings. On January 9, 2015, the Debtors filed a Bench Memorandum with the Idaho Court, which was joined by Blum and the Blum Trust, and in which the Debtors argued, among other things, that the Idaho Court was stayed from entering judgment against any of the defendants and also lacked jurisdiction to do so. On the same day, the Government also filed its brief arguing, among other things, that the Idaho Court could proceed with entering judgment against all of the defendants.

On January 12, 2015, the Idaho Court entered an order directing that judgment be entered against all defendants, but staying execution of the judgment against the Debtors.[6] On the same day, the Idaho Court entered a Final Judgment against the Debtors, the Blum Trust, and Mr. Blum, in which the Idaho Court, among other things, determined that "[t]o the extent Federal Resources Corporation is liable to the United States, the liability extends to Camp Bird Colorado, Inc., and Bentley J. Blum."

---

[6]    Federal and Camp Bird dispute the Idaho Court's ability to enter Final Judgment because, among other things, the Idaho Court is stayed under 11 U.S.C. § 362 and lacks jurisdiction, and Federal and Camp Bird reserve all rights with respect to the entry of the Final Judgment.

## III.    RELIEF REQUESTED

Through this Motion, the Debtors request that the Court exercise its equitable powers to substantively consolidate the Debtors for all purposes under Case No. 14-33427, and all of the Debtors' respective assets and liabilities will be merged with the valid liens of the secured creditors to remain undisturbed on the collateral securing their respective claims.

## IV.    LEGAL ANALYSIS

Courts have implied the authority to substantively consolidate proceedings from their equitable powers and 11 U.S.C. § 105(a).[7] *In re Horsley*, No. 99-30458 JAB, 2001 WL 1682013, at *4 (Bankr. D. Utah Aug. 17, 2001).[8] "The propriety of ordering substantive consolidation is primarily a factual question and is determined by a balancing of interests" of those seeking consolidation and those opposing it. *See Matter of Baker & Getty Fin. Servs., Inc.*, 78 B.R. 139, 142 (Bankr. N.D. Ohio 1987).

The Tenth Circuit has adopted a ten-prong test to aid courts in deciding whether to order substantive consolidation. *See Fish v. East*, 114 F.2d 177, 191 (10th Cir. 1940). In *Horsley*, this Court narrowed the *Fish* factors into "two general components: (1) the extent to which the entity to be substantively consolidated was managed or controlled by the debtor, and (2) whether the entity to be substantively consolidated had an economic existence independent from the Debtor." *In re Horsley*, 2001 WL 1682013, at *4. Additionally, substantive consolidation is proper where the assets of the entities in question are "'hopelessly commingled,' or where difficult accounting problems caused by intercompany debt are 'so strong that the great expense (in order to bring about an unscrambling) threaten[s] recovery.'" *In re Castle Arch Real Estate Inv. Co., LLC*, No. BR 11-35082, 2013 WL 492369, at *17 (Bankr. D. Utah Feb. 8, 2013) (quoting *Matter of Gulfco Inv. Corp.*, 593 F.2d 921, 928 (10th Cir. 1979)).[9]

---

[7] All code sections are from Title 11 of the United States Code unless otherwise identified.

[8] A copy of *In re Horsley* is attached hereto as **Exhibit A.**

[9] A copy of *In re Castle Arch Real Estate Inv. Co., LLC* is attached hereto as **Exhibit B**.

Here, substantive consolidation is justified as the Debtors are inextricably intertwined. The Debtors have the same management team.  Scott Butters, is the President and Director of both Debtors, and Mr. Blum is the sole other director of both Debtors.  *See* Federal Dkt. No. 28 (Statement of Financial Affairs) Question No. 21; Camp Bird Dkt. No. 26 (Statement of Financial Affairs) Question No. 21.  Federal is the 100% owner of Camp Bird, and Mr. Blum is the majority shareholder of Federal.  *Id.*  The Debtors maintain the same mailing address and keep their books and records at the same location in North Salt Lake, Utah.  *See* Federal Dkt. No. 1 (Voluntary Petition), Federal Dkt. No. 28 (Statement of Financial Affairs) Question No. 19; Camp Bird Dkt. No. 1 (Voluntary Petition); Camp Bird Dkt. No. 26 (Statement of Financial Affairs) Question No. 19.  Additionally, prior to the Petition Date, Camp Bird did not maintain a separate bank account.  Both Debtors' ongoing business operations were funded through a single bank account controlled by Federal.  Further, while the Debtors reserve all arguments on appeal of the Final Judgment in the Idaho Lawsuit, the Idaho Court asserted that the Debtors did not dispute that there was a unity of interests and ownership between the Debtors such that the individuality of these corporations have ceased.[10]

The Debtors' assets and liabilities overlap significantly.  For example, Aztec Energy Corporation, which paid for the ongoing business expenses of both Debtors, and the United States, are both significant creditors of both Debtors.  Federal Dkt. No. 28, Schedule F; Camp Bird Dkt. No. 26.  Additionally, Camp Bird's primary asset is the Camp Bird Properties, and Federal's primary asset is its ownership interests in Camp Bird.  As such, the Debtors believe that substantively consolidating these estates under Federal will provide a process for realizing the highest and best value for the Camp Bird assets, and will resolve competing, unliquidated and disputed claims in the most cost effective manner possible.

---

[10]    Camp Bird and Federal did dispute, among other things, that the observance of the corporate fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.

## V.    CONCLUSION

The Debtors' management, books and records, assets, and liabilities are inextricably intertwined. The Debtors therefore respectfully request that the Court enter an order substantively consolidating their respective bankruptcy estates into Federal's bankruptcy estate under Case No. 14-33427, and provide such other and further relief as is just and appropriate under the circumstances. A proposed form of order is attached hereto as **Exhibit C.**

DATED: January 26, 2015.

SNELL & WILMER L.L.P.

/s/

David E. Leta (USB # 1937)
Andrew V. Hardenbrook (Arizona Bar # 025518)
*Admitted pro hac vice*
*Counsel for Federal Resources Corporation and*
*proposed counsel for Camp Bird Colorado, Inc.*

## CERTIFICATE OF SERVICE

**Electronic Service (CM/ECF):**    I hereby certify that on January 26, 2015, I electronically filed the foregoing **MOTION FOR SUBSTANTIVE CONSOLIDATION OF DEBTORS' BANKRUPTCY ESTATES** with the United States Bankruptcy Court for the District of Utah using the Court's CM/ECF System.  I further certify that the parties of record in this case, as identified below, are listed as registered CM/ECF users and will be served through the CM/ECF system:

- James Vincent Cameron tr Vince.Cameron@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- David Dain David.Dain@usdoj.gov, katherine.tribbett@usdoj.gov
- Andrew V. Hardenbrook ahardenbrook@swlaw.com, jpollard@swlaw.com;docket_slc@swlaw.com
- Peter J. Kuhn tr Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- David E. Leta dleta@swlaw.com, wsmart@swlaw.com;btaylor@swlaw.com
- John B. Lyman john.lyman@usdoj.gov, Katherine.Tribbett@usdoj.gov
- Daniel D. Price daniel.price2@usdoj.gov, emily.goodman@usdoj.gov
- United States Trustee USTPRegion19.SK.ECF@usdoj.gov

/s/    *Andrew V. Hardenbrook*

# EXHIBIT A

In re Horsley, Not Reported in B.R. (2001)

2001 WL 1682013, 47 Collier Bankr.Cas.2d 103

2001 WL 1682013
United States Bankruptcy Court,
D. Utah, Central Division.

In re: Joseph Raymond HORSLEY
S.S.N. XXX–XX–XXXX and Lynda K.
Horsley S.S.N. XXX–XX–XXXX, Debtors.

No. 99–30458 JAB.   |   Aug. 17, 2001.

**Attorneys and Law Firms**

Michael N. Zundel, Esq., Glenn R. Bronson, Esq., Prince, Yeates & Geldzahler, Salt Lake City, for the Trustee.

Kenneth A. Rushton, Esq., Lehi, Chapter 7 Trustee.

Joseph Raymond Horsley, West Jordan, Debtor.

R. Mont McDowell, Esq., McDowell & Gillman, Salt Lake City, for the Debtor.

Steven T. Waterman, Esq., Rick B. Hoggard, Esq., Ray, Quinney & Nebeker, Salt Lake City, for Brighton Bank.

Joel T. Marker, Esq., McKay Burton & Thurman, Salt Lake City, for Attorney Title Guaranty Fund.

David M. Connors, Esq., Jonathan R. Schofield, Esq., Leboeuf Lamb Greene & Macrae, Salt Lake City, for Provident Bank.

Steven W. Dougherty, Esq., Anderson & Karre, Salt Lake City, for Millennia Investment Corp.

Peter J. Kuhn, Esq., Office of the United States Trustee, Salt Lake City.

Carolyn B. McHugh, Esq., Parr Waddoups Brown Gee & Loveless, Salt Lake City.

**MEMORANDUM DECISION AND ORDER
DENYING TRUSTEE'S MOTION FOR ORDER
GRANTING SUBSTANTIVE CONSOLIDATION
OF ESTATE OF JOSEPH RAYMOND
HORSLEY WITH ASSETS AND LIABILITIES
OF GRANITE TITLE NUNC PRO TUNC**

BOULDEN, Bankruptcy J.

*1   The Chapter 7 trustee (Trustee) filed a motion, pursuant to 11 U.S.C. § 105, seeking to substantively consolidate the assets and liabilities of Granite Title & Insurance Agency, Inc., (Granite Title) with the estate of one of the joint debtors, Joseph Raymond Horsley (Horsley). Upon consideration of the evidence produced, the arguments of counsel, and after review of applicable case law, the Court denies the motion for substantive consolidation upon the grounds set forth below.

**FACTS**

1. Horsley and Harlan Hammond (Hammond) founded Granite Title in 1996, with each of them owning a 50 percent interest in the company. Granite Title performed real estate closings and escrow functions and issued title insurance on real property. Horsley worked as an escrow officer for Granite Title for as long as it was a functioning entity.

2. After the initial organizational meeting, Hammond and Horsley met once a month to review the activities of Granite title, and kept corporate minutes of the meetings.

3. In mid 1997, Hammond suffered a debilitating stroke and resigned from Granite Title. He apparently relinquished any ownership interest in Granite Title to Horsley in early 1998, and is no longer affiliated with Granite Title. No action was taken to replace Hammond on Granite Title's Board of Directors.

4. Following Hammond's resignation from Granite Title, Horsley continued to keep some corporate minutes in a manner similar to how the minutes were previously kept with Hammond. Specifically, Horsley would produce minutes that on a specific date Granite Title approved certain asset purchases.

5. While at Granite Title, Horsley controlled Granite Title's escrow trust account held at Brighton Bank. The escrow trust account was used to hold premiums and escrow funds in trust for persons purchasing title insurance policies issued by Granite Title, and persons closing sales and purchases of real estate through Granite Title. The escrow trust account records were not accurate.

In re Horsley, Not Reported in B.R. (2001)

2001 WL 1682013, 47 Collier Bankr.Cas.2d 103

6. Horsley also maintained the records for Granite Title's operating account. The operating account was used for payroll and day to day operating expenses of the company. The operating account records were accurate.

7. On numerous occasions from February 1998 through July 1999, Horsley used funds from Granite Title's escrow trust account for his personal investments. Horsley made wire transfers of funds from Granite Title's escrow trust account to brokerage accounts held primarily in his own name, to be used for the purchase of securities or to meet margin calls.

8. Horsley also maintained a separate investment account funded by his personal monies.

9. Horsley testified that Granite Title funds were not co-mingled with funds from his personal investment account.

10. Horsley participated in real estate transactions that were processed by Granite Title in which Strata Funding Group Inc., Strata Marketing, Inc., and Household Properties, Inc., received monies from Granite Title's escrow trust account.

*2   11. David W. Goodman, Horsley's son-in-law, and David W. Goodman's uncle, Chris Goodman, were affiliated with Strata Funding Group Inc., Strata Marketing, Inc., and Household Properties, Inc.

12. Horsley transferred funds from Granite Title's escrow trust account to third parties in transactions unrelated to the business affairs of Granite Title.

13. Attorneys Title Guaranty Fund, Inc. (ATGF) underwrote the title insurance policies issued by Granite Title.

14. Upon discovery of Horsley's transactions related to Granite Title's escrow trust account, ATGF filed suit against Horsley in state court, Civil No. 9909096932, and effectively terminated Granite Title's operations in July 1999. The suit has been resolved as set forth below in paragraph 20.

15. ATGF also filed suit against David W. Goodman and others (characterized as the RICO Defendants)

related to the transactions involving Granite Title's escrow trust account. The action remains pending.

16. ATGF retained the accounting firm of Neilson Elggren LLP (Neilson) to analyze certain real estate purchase/sale and financing transactions processed by Granite Title through its escrow trust account for use in the litigation against the RICO Defendants.

17. Neilson prepared a thirty-four page report, plus exhibits, pursuant to Fed.R.Civ.P. 26(a) for the litigation against the RICO Defendants. The report detailed the transactions related to Granite Title's escrow trust account and the diversion of escrow account funds; calculated claims by third party lenders and the portion of damages attributable to various parties, and provided an opinion as to the damages asserted by Strata Funding Group and Household Properties. Neilson also assembled an multi-page report of the transactions in the escrow trust account showing the dates of transactions as well as clearance dates, item numbers, payees/ payors, memorandum descriptions, amounts, and a running book balance.

18. Neilson concluded that $530,007.07 was permanently diverted from the escrow trust account in certain real property transactions.

19. Of the specific real property escrow transactions analyzed by Neilson, approximately fifteen percent involved the diversion of funds from Granite Title's escrow trust account. The balance of the real property transactions processed by Granite Title were unrelated to the diversion of funds from Granite Title's escrow trust account.

20. On August 18, 1999, in resolution of the state court action brought by ATGF, Horsley consented to entry of judgment in the amount of $543,450 for monies owing as alleged in the compliant in connection with eleven closings at Granite Title.

21. Neilson also concluded that other funds totaling $994,294.97 were diverted from the Granite Title escrow trust account.

22. Neilson could not find ledger sheets for all transactions, and the purpose of many transactions remain unresolved, although the payors/payees have been determined.

In re Horsley, Not Reported in B.R. (2001)
2001 WL 1682013, 47 Collier Bankr.Cas.2d 103

*3  23. Neilson did not analyze Granite Title's operating account or its corporate records.

24. Neilson did not analyze Horsley's personal accounts.

25. Horsley and Lynda Kendall Horsley filed a joint petition seeking relief under chapter 7 on November 30, 1999.

26. The summary of amended schedules filed in the chapter 7 case lists $559,396 in debt. Of that amount, $543,450 represents the judgment that Horsley owed to ATGF, leaving a balance of $15,946 in unsecured debt owed to five consumer creditors unrelated to transactions with Granite Title.

27. Horsley's total assets in summary of amended schedules are listed at $620; consisting only of "personal property."

28. The Trustee has investigated claims that might be brought against various parties if Horsley's estate is substantively consolidated with the assets and claims of Granite Title. He has concluded that there are numerous transactions that may give rise to preferential and fraudulent transfer causes of action, fraud causes of action, and/or causes of action under Utah's Fiduciaries Act. The Trustee also believes that Granite Title may have Fiduciary Act causes of action against Brighton Bank, the holder of the Granite Title escrow trust account.

29. If substantive consolidation is granted, but the effective date is not effective *nunc pro tunc* to the date of filing of Horsley's case, the Trustee believes most of the causes of action he has investigated would be bared as untimely.

30. The Trustee has not investigated the corporate books of Granite Title to determine if they were properly maintained.

31. At the time Granite Title ceased operations, it had certain assets consisting of a lease on its premises from Brighton Bank, modest funds in its operating and reserve accounts, and office equipment including desks, computers, conference tables, file cabinets and a phone system that Horsley valued in excess of $10,000.

32. At the time Granite Title ceased operations, its accounts payable included rent to Brighton Bank, a modest amount to vendors for office supplies, a phone bill, and an amount to ATGF on title policies.

### DISCUSSION

The Trustee's motion to consolidate is a core proceeding, and this court may enter a final order resolving the motion. 28 U.S.C. § 157(b)(A) and (O). The Trustee seeks substantive consolidation of the assets and liabilities of nondebtor Granite Title with Horsley's case only [1] and asks that such consolidation be made effective *nunc pro tunc* to November 30, 1999. The Trustee stresses that the relief sought is not to consolidate Horsley with Granite Title, for to do so may impact the Trustee's future ability to proceed under Utah's Fiduciaries Act, but only to consolidate the assets and liabilities of both. In support of his motion, the Trustee calls upon the equitable powers of the Court as set forth in 11 U.S.C. § 105. [2]

Substantive consolidation developed as judge made law under the Bankruptcy Act of 1898. *See e.g. In re Sampsell v. Imperial Paper Corp.,* 313 U.S. 215 (1941), *reh'g denied,*313 U.S. 600 (1941)(implicitly approving substantive consolidation under the Act in the context of a creditor's claim status); *Fish v. East,* 114 F.2d 177 (10th Cir.1940)(analyzing substantive consolidation under the Act). While the Act contained no express authority for the practice, the ability to order substantive consolidation was implied from the bankruptcy court's general equitable powers. [3] *Reider v. Federal Deposit Insurance Corp.,* 31 F.3d 1102, 1105 (11th Cir.1994)(citing *Pepper v. Litton,* 308 U.S. 295, 304 (1939)("courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.")).

*4  Unlike related provisions allowing for procedural consolidation or joint administration, substantive consolidationescaped codification in the Bankruptcy Reform Acts of 1978 and 1994. *In re Bonham,* 229 F.3d 750, 763 (9th Cir.2000). Notwithstanding, substantive consolidation continues to be utilized under the Code as a manifestation of the broad equitable power detailed in 11 U.S.C. § 105(a). As set forth in the Advisory Committee Note to Fed. R. Bankr.P. 1015 [4], substantive consolidation affects the substantive rights of the creditors of the different estates; it creates one common pool consisting of assets, liabilities, and a single

In re Horsley, Not Reported in B.R. (2001)
2001 WL 1682013, 47 Collier Bankr.Cas.2d 103

body of creditors, while at the same time extinguishing the liabilities between the consolidated parties.[5] *Bonham,* 229 F.3d at 764; *Federal Deposit Insurance Corp. v. Colonial Realty Co.,* 966 F.2d 57, 58–59 (2d Cir.1999). As such, it is only available after extreme caution is taken to ensure that such a measure is warranted. *See In re Flora Mir Candy Corp.,* 432 F.2d 1060, 1062 (2d Cir.1970).

Beginning with *Fish,* 114 F.2d 177 and continuing in *Federal Deposit Ins. Corp. v. Hogan (In re Gulfco Invest. Corp.),* 593 F.2d 921 (10th Cir.1979), this Circuit determined that substantive consolidation may be employed in the appropriate circumstances. Those circumstances are set forth in *Gulfco* which adopted the ten prong test in *Fish.* The *Gulfco/ Fish* criteria can be reduced into two general components: (1) the extent to which the entity to be substantively consolidated was managed or controlled by the debtor, and (2) whether the entity to be substantively consolidated had an economic existence independent from the Debtor. Application of the *Gulfco/Fish* criteria is difficult under the present circumstances because the Trustee's motion proposes substantive consolidation of an individual with a corporate entity,[6] whereas *Gulfco* anticipates, as does much of the case law, substantive consolidation of a parent corporation with a subsidiary or corporate affiliate.[7] This Court concludes that the Trustee has proved the first but not the second component of the *Gulfco/Fish* criteria.

Assuming, arguendo, that Horsley is viewed as the parent corporation, an application of the *Gulfco/Fish* criteria indicates that Horsley was one of the incorporators of Granite Title, that he was presumably the sole owner, and that he had exclusive control of Granite Title after Hammond's withdrawal. However, Granite Title was an independent entity, generating its own income apart from Horsley. It was Granite Title, that financed Horsley, rather than the reverse. Granite Title had an independent financial existence apart from Horsley prior to 1998, and continued its title business even after Horsley began invading the escrow trust account. Finally, to a limited extent, Granite Title continued to maintain corporate minutes. Therefore, all of the *Gulfco/ Fish* tests related to the parent's financial dominance over the entity to be consolidated necessarily fail.

  *5 Apart from the application of the *Gulfco/Fish* factors, *Gulfo* also considers substantive consolidation of two corporate entities appropriate "where a corporation is a mere instrumentality or alter ego of the bankrupt corporation, with no independent existence of its own." *Gulfco,* 593

F.2d at 928; *Fish,* 114 F .2d 177 (analyzing the consolidation of a subsidiary created to hinder and delay creditors), *cf. In re Alpha & Omega Realty,* 36 B.R. 416 (Bankr.D.Idaho.1984)(declining to substantively consolidate nondebtor entities with the debtor when the parties were not alter egos of each other). Such was certainly not the case here.[8] Granite Title was an operating title company, and although Horsley raided its escrow trust account, eighty-five percent of its closings were not involved in Horsley's transactions that were ultimately the subject of ATGF's state court action. Therefore, this Court's finds insufficient evidence in the record that Granite Title existed as a "corporate shell" or "sham operation" existing only in furtherance of Horsley's improper financial dealings. *In re Lease–A–Fleet, Inc.,* 141 B.R. 869, 878 (Bankr.E.D.Pa.1992).

In addition, *Gulfco* stresses that for substantive consolidation to be appropriate, the assets of the entities must be "hopelessly commingled." *Gulfco,* 593 F.2d at 929.Far from being hopelessly commingled, the evidence indicates that ATGF has already unraveled the transactions emanating from Granite Title's escrow trust account to the extent of multiple pages of detailed account reconstruction. Even though every conceivable transaction is not fully accounted for and every transfer has not been explained, this is certainly not a case where it is impossible to ascertain the origin and final disposition of the funds. Therefore, the Court concludes that the Trustee has not carried his burden of proof under the criteria set forth in *Gulfco.*

Were this Court to apply various tests outside this Circuit to determine whether substantive consolidation is applicable, the Trustee's motion would still be denied. For example, the two-part test in *In re Snider Brothers, Inc.,* 18 B.R. 230, 238 (Bankr.D.Mass.1982), requires that the applicant must show that there is a necessity for substantive consolidation, or a harm to be avoided by its use. The three-part test in *In re Auto–Train Corp.,* 810 F.2d 270, 276 (D.C.Cir.1987), requires that the proponent show a substantial identity between the entities; consolidation is necessary to avoid some harm or to realize some benefit, and that if a creditor objects on the grounds that it relied on the separate credit of one of the entities to its prejudice; and that consolidation may be ordered only if the benefits heavily outweigh the harm. The test in *Union Savings Bank v. Augie/Restivo Baking Co, (In re Augi/Restivo Baking Co.),* 860 F.2d 515, 518 (2nd Cir.1988), is whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity

2001 WL 1682013, 47 Collier Bankr.Cas.2d 103

before extending credit. Finally, the substance of the test in *In re Vecco Construction Industries, Inc.,* 4 B.R. 407, 410 (Bankr.E.D.Va.1980), requires that a court consider the identity and shared financial interests of the parties to be consolidated, and the benefit to be gained in light of the harm to be avoided. Summarizing these tests, the threshold criteria that the movant must meet is that there is a necessity for consolidation, that the benefit realized outweighs the harm to be avoided, and that there is a substantial identity between the debtor and the entity to be consolidated.

**\*6** The necessity for substantive consolidation in this case is to allow the Trustee to more easily reach the recipients of alleged preferences and fraudulent conveyances. Substantive Consolidation may avoid the harm of allowing recipients of alleged transfers to retain the funds, and may realize the benefit of increasing the dividend to creditors. While the result is laudable, such a benefit oriented approach ignores the underpinning of substantive consolidation—that there be a substantial identity between Horsely and Granite Title. Rather, under the circumstances at hand, this Court finds most significant the question of whether there is a substantial identity between Horsley and Granite Title.

In this case, there is little support for a finding that there was a substantial identity between the parties. The majority of Granite Title's business transactions were independent of Horsley's improper conduct. There is contradictory evidence as to whether Horsley commingled his own monies with those from Granite Title's escrow account. There is uncontradicted evidence that at least some level of corporate formalities associated with Granite Title were continued after Hammond withdrew. In light of all these considerations, this Court cannot conclude that the Trustee has shown a substantial identity between Horsley and Granite Title.

The significance of a lack of identity in this case is amplified by the Trustee's request that this Court order substantive consolidation *nunc pro tunc* to November 30, 1999, the date of the filing of Horsley's petition. If this Court were to determine that substantive consolidation were appropriate here, "[t]he order of consolidation [would rest] on the foundation that the assets of all of the consolidated parties are substantially the same."*First National Bank v. Rafoth (In re Baker & Getty Financial Services, Inc.),* 974 F.2d 712, 721 (6th Cir.1992). Thus, to grant *nunc pro tunc* relief, it would inherently follow that this Court found a substantial identity exists between the parties to be consolidated. As set forth above, the evidence before this Court cannot support of a finding of substantial identity between Horsley and Granite Title.

Nonetheless, *nunc pro tunc* relief is sought because substantive consolidation would be ineffective without the reach back because the causes of action anticipated by the Trustee may be time barred. [9] Therein lies friction between the Code and the effective use of substantive consolidation. The Code fixes the limitations on avoiding powers in 11 U.S.C. § 546. Granting the Trustee's motion would circumvent that Code provision under the broad guise of employing equity. 11 U.S.C. § 105 may only be used in furtherance, not in contravention, of the Code. *See Matter of Fesco Plastics Corp., Inc.,* 996 F.2d 152, (7th Cir.1993)(reasoning that in the context of post-petition interest on claims, a bankruptcy court may not invoke § 105 to add something to the Code or to achieve a result inconsistent with what the Code provides). The *nunc pro tunc* relief sought is also inconsistent with this Circuit's ruling in *Crosby v. Mills,* 413 F.2d 1273, 1277 (10th Cir.1969) (stating that *nunc pro tunc* orders cannot be used to reflect something that did not occur, only to correct a mistake or error that actually occurred). Therefore, even if this Court were to determine substantive consolidation was warranted, it is not persuaded to accord *nunc pro tunc* relief.

**\*7** Also disconcerting is the jurisdictional quandary this Court is faced with in considering substantive consolidation of a debtor and nondebtor. While such a scenario was implicitly recognized by the Supreme Court in *In re Sampsell,* 313 U.S. 215, and expressly approved by other courts, *see e.g. In re United Stairs Corp,* 176 B.R. 359 (Bankr.D.N.J.1995); *In re Tureaud,* 59 B.R. 973 (N.D.Okla.1986); *In re Crabtree,* 39 B.R. 718 (Bankr.E.D.Tenn.1984); *In re 1438 Meridian Place N.W., Inc.,* 15 B.R. 89 (Bankr.D.D.C.1981), there exist other equally persuasive arguments from courts that have refused to take jurisdiction over a nondebtor. *See Helena Chemical Co. v. Circle Land and Cattle Corp. (In re Circle Land and Cattle Corp.),* 213 B.R. 870 (Bankr.D.Kan.1997); *In re Hamilton,* 186 B.R. 991 (Bankr.D.Colo.1995); *Lease–A–Fleet, Inc.,* 141 B.R. 869.

As a court of limited jurisdiction, this Court only obtains jurisdiction over an entity by the filing of a petition, either voluntarily or involuntarily pursuant to 11 U.S.C. §§ 301 or 303. Substantive consolidation of a nondebtor entity with an existing debtor circumvents that process and raises issues as to whether employing this judge-made mechanism is sufficient to obtain subject matter or personal jurisdiction

In re Horsley, Not Reported in B.R. (2001)

2001 WL 1682013, 47 Collier Bankr.Cas.2d 103

---

over a nondebtor. *Circle Land and Cattle Corp.,* 213 B.R. at 876–77 (citing *In re Schwinn Bicycle Co.,* 210 B.R. 747, 761 (Bankr.N.D.Ill.1997)("Section 105(a) gives the bankruptcy court authority to 'issue any order, process, or judgment that is necessary ir appropriate to carry out the provisions of this title....' However, a bankruptcy judge can use such authority only if core or related jurisdiction otherwise lies over subject matter of the dispute.")); *In re S.T.R. Corp.,* 66 B.R. 49, 51 (Bankr.N.D.Ohio 1986)("Section 105 is not jurisdictional and does not grant the court jurisdiction which it does not already possess.")); *but see, Bonham,* 229 F.3d at 765 (citing cases allowing consolidation of nondebtor and debtor entities in furtherance of the equitable goals of substantive consolidation). Certainly, for substantive consolidation to effectively bring a nondebtor within the jurisdiction of this court, the identity of the nondebtor must be so far subsumed in the debtor that they are as one. Furthermore, substantive consolidation acts as an "end run" around the requirements and potential consequences under § 303 as well as leaving unanswered the question of what rights or protections attach to a consolidated nondebtor, e.g. automatic stay under § 362, avoiding powers under §§ 542–549. *Lease–A–Fleet, Inc.,* 141 B.R. at 873–74. To order substantive consolidation in this case rides rough-shod over the basic tenants of this Court's jurisdiction. Even when the goal is to enhance the assets of the estate, estate enhancement alone is not of sufficient benefit,

in this Court's view, to allow equity to defeat the statutory jurisdiction and limitations periods set forth in the Code.

**\*8** Although the Trustee laudably seeks the ability to file causes of action against various entities to seek return of misappropriated funds and enhance the assets of the combined estate, and thus benefit all creditors, that goal does not outweigh the harm that would be caused by granting this motion. In essence, the Trustee seeks substantive consolidation, not to enhance the reorganization of multiple hopelessly intertwined debtors treated by parties as one unit, but instead as a mechanism to expand the statutory limitations periods to recover from third parties funds misappropriated from an autonomous nondebtor. This is simply an attempt to do indirectly that which the Code prohibits. Therefore, it is hereby

ORDERED, that the Motion for Order Granting Substantive Consolidation of Estate of Joseph Raymond Horsley with Assets and Liabilities of Granite Title *Nunc Pro Tunc* is Denied.

**Parallel Citations**

47 Collier Bankr.Cas.2d 103

---

Footnotes

1    Horsley and Lynda Kendall Horsley filed a joint case pursuant to 11 U.S.C. § 302(a). Although there has been no court determination pursuant to 11 U.S.C. § 302(b) regarding the consolidation of Horsley and Lynda Kendall Horsley's estate, since November 30, 1999, it appears that the case has been administered in a consolidated fashon.

2    11 U.S.C. § 105(a) provides in relevant part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

3    For a critical assessment of the bankruptcy court's equity power *see* Hon. Marcia Krieger, *"THE BANKRUPTCY COURT IS A COURT OF EQUITY": WHAT DOES THAT MEAN?,* 50 S.C. L. REV. 275 (1999).

4    The Advisory Committee Note to Fed. R. Bankr.P. 1015 provides in relevant part: "Consolidation, as distinguished from joint administration, is neither authorized nor prohibited by this rule since the propriety of consolidation depends on substantive considerations and affects the substantive rights of the creditors of the different estates."

5    To best effectuate the equities of substantive consolidation, some courts have found that the court may limit the consolidation to certain classes of claims, specific property, or may otherwise condition the consolidation within its discretion. *See In re Cooper,* 147 B.R. 678, 682 (Bankr.D.N.J.1992); *In re Steury,* 94 B.R. 553, 557 (Bankr.N.D.Ind.1988); *In re Parkway Calabasas, Ltd.,* 89 B.R. 832, 837 (Bankr.C.D.Ca.1988), *aff'd* 949 F.2d 1058 (9th Cir.1991).

6    *See e.g. In re Bonham,* 229 F.3d at 765–69; *In re New Center Hospital,* 179 B.R. 848, 853 (Bankr.E.D.Mich.1994), *aff'd in part, rev'd in part,* 187 B.R. 560 (E.D.Mich.1995); *In re Mumford, Inc.,* 115 B.R. 390, 397 (Bankr.N.D.Ga.1990); *In re Tureaud,* 45 B.R. 658, 662 (Bankr.N.D.Okla.1985), *aff'd* 59 B.R. 973 (N.D.Okla.1986).

7    *See e.g. In re Hemingway Transport,* 954 F.2d 1 (1st Cir.1992); *In re Affiliated Foods, Inc.,;* 249 B.R. 770 (Bankr.W.D.Mo.2000); *In re American Way Service Corp.,* 229 B.R. 496 (Bankr.S .D.Fla.1999); *In re United Stairs Corp.,* 176 B.R. 359 (Bankr.D.N.J.1995); *In re Vecco Construction Industries, Inc.,* 4 B.R. 407 (Bankr.E.D.Va.1980).

8    On May 9, 2001, this Court entered a Default Judgment against ATGF, Advance Financial Services, Inc., Granite Title Insurance Agency, and R & M Funding Group L.L.C., in Adversary Proceeding No. 00P–2173JAB. Therein, the Court "ORDERED,

ADJUDGED and DECREED that, pursuant to Counts 1, 2 and 3 of the Trustee's Second Cause of Action in this proceeding, Advance Financial, Granite Title and R & M Funding area each the alter ego of the Debtor Joseph Raymond Horsley ."Despite that ruling, this Court will not predicate an order of substantive consolidation that requires a determination of mutual identity, upon a finding of alter ego in a default judgment.

9    During closing argument, the Trustee offered a distinction between *nunc pro tunc* and the general concept of "relation back ." He argued that relation back is more suited to the context of this case and that this Court should not disfavor making November 30, 1999, the effective date merely because of its historical reticence to granting *nunc pro tunc* requests. Under the facts of this case, the Court is less concerned with the guise of the retroactive date than its effect on parties. Alternatively, the Trustee argued that this Court need not make a determination at this time on whether to grant the *nunc pro tunc* request. This Court, however, declines the Trustee's invitation and recognizes that if it determined substantive consolidation were warranted, "[t]he order of consolidation [would rest] on the foundation that the assets of all of the consolidated parties are substantially the same. Therefore, the earliest filing date [would be] the controlling date, and all transfers ... analyzed as of that date."*First National Bank v. Rafoth (In re Baker & Getty Financial Services, Inc .),* 974 F.2d 712, 721 (6th Cir.1992).

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2013 WL 492369
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
D. Utah.

In re CASTLE ARCH REAL ESTATE INVESTMENT
COMPANY, LLC; CAOP Managers, LLC; Castle Arch
Kingman, LLC; Castle Arch Secured Development
Fund, LLC; Castle Arch Smyrna, LLC; Castle
Arch Opportunity Partners I, LLC; and Castle
Arch Opportunity Partners II, LLC, Debtors.

Nos. 11–35082, 11–35237, 11–35240, 11–35241,
11–35242, 11–35243, 11–35246.   |   Feb. 8, 2013.

**Attorneys and Law Firms**

Peggy Hunt, Chris Martinez, Nathan S. Seim, Dorsey &
Whitney LLP, Salt Lake City, for D Ray Strong, Chapter
11 Trustee for Castle Arch Real Estate Investment Company,
LLC.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN SUPPORT OF ORDER GRANTING CHAPTER
11 TRUSTEE'S MOTION TO SUBSTANTIVELY
CONSOLIDATE CAOP MANAGERS, LLC;
CASTLE ARCH KINGMAN, LLC; CASTLE ARCH
SMYRNA, LLC; CASTLE ARCH SECURED
DEVELOPMENT FUND, LLC; CASTLE ARCH
STAR VALLEY, LLC AND CASTLE ARCH
REAL ESTATE INVESTMENT COMPANY, LLC**

JOEL T. MARKER, United States Bankruptcy Judge.

**\*1** An evidentiary hearing was held by this Court on
January 31, 2013 on the *Chapter 11 Trustee's Motion to
Substantively Consolidate CAOP Managers, LLC; Castle
Arch Kingman, LLC; Castle Arch Smyrna, LLC; Castle Arch
Secured Development Fund, LLC; Castle Arch Star Valley,
LLC and Castle Arch Real Estate Investment Company, LLC*
(the *"Consolidation Motion"*) [1] filed by D. Ray Strong, duly
appointed Chapter 11 Trustee for Castle Arch Real Estate
Investment Company, LLC (the *"Trustee"*).Appearances
were made by Peggy Hunt and Nathan S. Seim, Dorsey &
Whitney LLP, on behalf of the Trustee; Lon A. Jenkins,
Jones Waldo Holbrook & McDonough, P.C., on behalf of
the Official Committee of Unsecured Creditors for Castle

Arch Real Estate Investment Company, LLC (the *"Creditors'
Committee"*); John T. Morgan on behalf of the Office of the
United States Trustee; Andrew B. Clawson, Pearson Butler
Carson & Cook, PLLC, on behalf of Castle Arch Secured
Development Fund, LLC; Michael L. Labertew, Labertew &
Associates, LLC, on behalf of Castle Arch Smyrna, LLC,
Caste Arch Kingman, LLC and CAOP Managers, LLC; and
Richard Dance, *pro se.*

At the hearing, the Court admitted into evidence Trustee's
Exhibits A–JJJ based on the uncontested proffer of the
Trustee's testimony as set forth in the *Declaration of D.
Ray Strong, Chapter 11 Trustee for Castle Arch Real
Estate Investment Company, LLC, in Support of Motion to
Substantively Consolidate CAOP Managers, LLC; Castle
Arch Kingman, LLC; Castle Arch Smyrna, LLC; Castle Arch
Secured Development Fund, LLC; Castle Arch Star Valley,
LLC and Castle Arch Real Estate Investment Company,
LLC (Exhibit Admission)* (the *"Document Declaration"*). [2]
Furthermore, the Court accepted the uncontested proffer
of the Trustee's testimony as stated in the *Declaration of
D. Ray Strong, Chapter 11 Trustee for Castle Arch Real
Estate Investment Company, LLC, in Support of Motion to
Substantively Consolidate CAOP Managers, LLC; Castle
Arch Kingman, LLC; Castle Arch Smyrna, LLC; Castle Arch
Secured Development Fund, LLC; Castle Arch Star Valley,
LLC and Castle Arch Real Estate Investment Company, LLC*
(the *"Trustee Declaration"*), [3] as well as the uncontested
proffer of testimony of Nathan S. Seim stated on the record.

Based on the Consolidation Motion; the *Memorandum of Law
in Support of Chapter 11 Trustee's Motion to Substantively
Consolidate CAOP Managers, LLC; Castle Arch Kingman,
LLC; Castle Arch Smyrna, LLC; Castle Arch Secured
Development Fund, LLC; Castle Arch Star Valley, LLC
and Castle Arch Real Estate Investment Company, LLC* [4];
the *Notice of Chapter 11 Trustee's Motion to Substantively
Consolidate CAOP Managers, LLC; Castle Arch Kingman,
LLC; Castle Arch Smyrna, LLC; Castle Arch Secured
Development Fund, LLC; Castle Arch Star Valley, LLC and
Castle Arch Real Estate Investment Company, LLC and
Notice of Hearing* (the *"Notice of Hearing"*) [5]; the *Certificate
of Service* attached to the Notice of Hearing; the Document
Declaration; the Trustee Declaration; the evidence presented
and received at the hearing, including Exhibits A–JJJ noted
above, as well as the testimony of the Trustee and Nathan
Seim; the representations and arguments of counsel; the
applicable law; and for good cause appearing, the Court

2013 WL 492369

granted the Consolidation Motion on the record at the hearing and made limited findings of fact and conclusions of law on the record, which are incorporated herein by this reference.

**\*2** Pursuant to Federal Rule of Bankruptcy Procedure 7052 and this Court's Local Rules, the Court now enters these Findings of Fact and Conclusions of Law in support of its *Order Granting Chapter 11 Trustee's Motion to Substantively Consolidate CA OP Managers, LLC; Castle Arch Kingman, LLC; Castle Arch Smyrna, LLC; Castle Arch Secured Development Fund, LLC; Castle Arch Star Valley, LLC and Castle Arch Real Estate Investment Company, LLC* entered concurrently herewith. To the extent that any Findings of Fact are Conclusions of Law, they are adopted as such, and to the extent that any Conclusions of Law are Findings of Fact, they are adopted as such.

## *I.*

## *JURISDICTION AND NOTICE*

### *Jurisdiction*

1. On October 17, 2011 (the "*CAREIC Petition Date*"), Castle Arch Real Estate Investment Company, LLC ("*CAREIC*")filed a petition seeking relief under Chapter 11 of the Bankruptcy Code, and on October 20, 2011 (together, the October 20, 2011 and the CAREIC Petition Date are referred to herein as the "*Petition Date* ") CAOP Managers, LLC ("*CAOP Managers* "), Castle Arch Kingman, LLC ("*CAK*"), Castle Arch Secured Development Fund, LLC ("*CASDF* "), Castle Arch Smyrna, LLC ("*CAS*"), Castle Arch Opportunity Partners I, LLC ("*CAOP I*") and Castle Arch Opportunity Partners II, LLC ("*CAOP II* ") (collectively with CAREIC, the "*Debtors* ") also filed Chapter 11 petitions.

2. This Court has subject matter jurisdiction over the Consolidation Motion pursuant to 11 U.S.C. § 105 and 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

3. This Court has personal jurisdiction over CAREIC, CAOP Mangers, CAK, CAS and CASDF, and over Castle Arch Star Valley, LLC ("*CASV* "), a non-debtor (collectively, the "*Legacy Debtors*"). The Trustee, as the trustee of CAREIC and as manager of the other Legacy Debtors, controls the

Legacy Debtors, which Legacy Debtors, through the Trustee, have consented to the jurisdiction of this Court.

### *Notice And Lack Of Objection*

4. Based on the evidence presented at the hearing, the mailing matrix attached to the Notice of Hearing [6] is a true and correct listing of all known parties in interest.

5. All parties in interest, including all known creditors and interest holders, were (a) served with the Notice of Hearing, which also provided notice of the relief sought in the Consolidation Motion; and (b) provided an opportunity to be heard.

6. No objections to the Consolidation Motion were filed with the Court.

7. The Trustee has presented a letter dated January 12, 2013 from Lindy L. Conner stating that Ms. Conner opposes the Consolidation Motion. [7] However, Ms. Conner did not appear at the hearing on the Consolidation Motion, and based on the evidence, [8] the Court finds that any objection being made by Ms. Conner has been withdrawn.

## *II.*

## *PROCEDURAL HISTORY*

### *The Entities In Question And The Trustee's Appointment And Investigation*

**\*3** 8. In the Consolidation Motion, the Trustee seeks to substantively consolidate only the "*Legacy Debtors*"— defined above as a collective reference to CAREIC, CAOP Managers, CAK, CASDF, CAS and non-debtor CASV—but not Debtors CAOP I and CAOP II (together, CAOP I and CAOP II are the "*CAOP Debtors* "). [9]

9. After the Petition Date, the Debtors continued to operate their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

10. On February 14, 2012, the Creditors' Committee in CAREIC's Chapter 11 case filed a *Motion to Appoint a*

2013 WL 492369

*Chapter 11 Trustee Under 11 U.S.C. § 1104 or, in the Alternative, to Convert Case Under 11 U.S.C. § 1112* (the "*Trustee Motion*"),[10] which Trustee Motion was opposed by the Debtors and certain parties in interest. After an evidentiary hearing, the Debtors represented to the Court that they were stipulating to the appointment of a Chapter 11 trustee in CAREIC's case. The Court accepted the stipulation, finding:

> Given the fact that the testimony was that the affiliates have really never had any separate operating boards, I think it makes sense, since counsel are here for the affiliates, that they advise whoever they're reporting to that there shouldn't be any substantial transactions pending a review of the whole landscape by the trustee in the CAREIC case.[11]

11. On April 30, 2012, the Court entered its *Order for Appointment of Trustee,*[12] ordering the United States Trustee to appoint a qualified person to serve as trustee, and on May 3, 2012, the Court entered its *Order Approving Appointment of Trustee,*[13] appointing Mr. Strong as the Chapter 11 Trustee for CAREIC.

12. The Trustee is a highly qualified, certified and licensed forensic accountant, with more than 18 years of experience providing investigative accounting, bankruptcy and litigation services, including significant experience serving as a fiduciary.[14]

13. The Trustee, together with his Court-appointed professionals, acting at his direction, have conducted an investigation of the Debtors, CASV and other affiliated non-debtor entities, including by (a) reviewing the Debtors' books and records; (b) reviewing public records related to the Debtors, including filings with the Securities and Exchange Commission (the "*SEC*"), relevant state governmental entities and this Court; (c) interviewing or deposing numerous persons, including members of former management; (d) discussing the Debtors and their respective cases with counsel for Creditors' Committee, former counsel for CAREIC, counsel for entities who represent the Debtors other than CAREIC, and creditors and investors; and (e) investigating the nature, extent and value of the real property owned by the Legacy Debtors, including by reviewing land records, and meeting with city officials and engineers. This investigation is still on-going.[15]

## III.

## FACTS IN SUPPORT OF CONSOLIDATION

### A.

### Debtors' Corporate Organization

*4 14. CAREIC is a California limited liability company domesticated in Utah; CAOP Managers and CASV are Utah limited liability companies, with CASV being domesticated in Wyoming; and CAK, CASDF and CAS are Nevada limited liability companies.[16]

15. CAREIC owns all or substantially all of the membership interests of each of the other Legacy Debtors.[17]

16. Since their organization, CAREIC has served as the sole manager of CAK, CAS, CASDF, CASV and CAOP Managers.[18]

### B.

### Common Management, Offices, Bank Accounts, Accounting and Reporting

17. Prior to the Petition Date, all of the Debtors, as well as numerous affiliated non-Debtor entities (collectively, the "*Castle Arch Entities*"), such as CASV, were managed by a single paid management team. Thus, CAREIC's Board of Directors and Officers also managed the other Debtors and Castle Arch Entities.[19]

18. The CAREIC Board of Directors met periodically and kept minutes of its meetings, many of which are unsigned, but no separate Board meetings for any of the Legacy Debtors were held inasmuch as any business of these entities was dealt with in CAREIC Board meetings.[20]

19. CAREIC employees, such as accountants, performed accounting and many other administrative services for all of the Debtors and Castle Arch Entities on a consolidated basis.[21]

20. While some of the individual members of CAREIC's management team maintained offices in their respective places of residence, many of the administrative services, such as accounting and bookkeeping, were conducted for all entities on a consolidated basis by a single group of employees out of a single office located in Utah. [22]

21. Private Placement Memoranda issued by the Legacy Debtors to prospective investors represented that CAREIC would manage and control the relevant Legacy Debtor. [23]

22. For example, a Private Placement Memorandum issued for CASDF consistently states throughout that CAREIC, not CASDF, would be managing investor funds, [24] and that:

> As of the date of this offering, CAREIC owns all common units of [CASDF] and members of CAREIC's management team effectively control [CASDF].

> ....

> As of February 1, 2008, we had only limited cash in connection with start-up activities. CAREIC currently provides all of our management functions and will cover our working capital requirements and has sufficient cash available to do so during the next 12 months.

> ....

> Our business is managed by CAREIC which manages and controls our affairs and has responsibility and final authority in almost all matters affecting our business. These duties include dealings with members and holders of our Preferred Units[,] accounting, tax and legal matters, communications and filings with regulatory agencies and all other needed management and operational duties. Additionally, because five officers and directors own a controlling interest in CAREIC, they may be deemed to control our activities through CAREIC. As our only Manager, CAREIC has complete authority and responsibility for:

> **\*5**  • underwriting and originating our investments;

> • deciding what agreements we enter into and whether we enter into participations with other investors;

> • managing our investments; and

> • managing all our other operations.

> Holders of our Preferred Units have no right to participate in the management and control of our business or affairs. CAREIC has complete responsibility for the selection, evaluation and negotiation of our investments. CAREIC provides all managerial, executive, supervisory and administrative services for our operations, including managing the investments we hold. Our books and records are maintained by CAREIC, and are audited by independent certified public accountants. [25]

23. Also, CASDF's Operating Agreement, which was attached to this Private Placement Memorandum, states that CAREIC "shall direct, manage and control the business of [CASDF] to the best of its ability and shall have full and complete authority, power and discretion to make any and all decisions and to any and all things which [CAREIC] shall deem to be reasonably required to accomplish the business and objections of [CASDF]." [26]

24. Despite requiring CAREIC to handle all operations of CASDF, [27] neither the Private Placement Memorandum nor CASDF's Operating Agreement make any provision for how much CAREIC is to be compensated for its services. [28]

25. Bank accounts were opened for the Debtors and many of the Castle Arch Entities, and all of these bank accounts were controlled by CAREIC's management. The use of these funds is discussed in greater detail in ¶¶ 46–59 below, but generally cash raised from investors, which was the primary source of the Legacy Debtors' cash, was used indiscriminately by the Debtors to fund whatever entity was in need of cash at any given time. [29]

26. Reporting required to be made to the SEC was done on a consolidated basis. [30]

27. Separate accounting records and General Ledgers were maintained for each of the Legacy Debtors. [31]

28. However, large volumes of transactions between the Legacy Debtors were being accounted for and reported in numerous, and often, commingled intercompany General Ledger accounts. [32]

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

29. Furthermore, often the book entries do not identify the applicable Legacy Debtor to which the transaction relates, and transactions are summarized by very general or inadequate descriptions or do not reflect the true nature of the transaction booked. [33]

30. Additionally, there are large "bulk" summarized transactions within CAREIC's commingled intercompany accounts with very little information regarding the numerous underlying transactions. [34]

31. There also is evidence that services provided to several Legacy Debtors were being invoiced on a consolidated basis, and the payment of those services was only being accounted for by CAREIC, and not allocated to the individual Legacy Debtor who received the services or benefit. [35]

*6  32. Finally, CAREIC consolidated debts of the other Legacy Debtors in its notes payable schedules and analyses. [36]

### C.

### *Legacy Debtor Formation and Fundraising*

33. With the exception of relatively limited revenues from the sale of certain property holdings, neither CAREIC nor any of the other Legacy Debtors had any operating revenue. [37] Rather, operations were primarily funded by monies raised from investors in a series of public offerings, each of which is summarized on Exhibit B, entitled "*Timeline of Castle Arch EntityFormations and Investment Offerings*" (the "*Timeline*"). [38]

34. According to the Debtors' records, the Debtors raised a total of $73,593,717.00 (as reported in the Debtors' Master Tracking Sheet maintained to track investor funds), net of redemptions, from investors during the period of May 2004, when CAREIC made its initial Series A offering, through the Petition Date. [39]

35. The Trustee's charts graphing cash and public offerings set forth in Exhibits E, F and G (collectively, the "*Cash Charts*")and the Timeline demonstrate a pattern. As cash was consumed and additional cash was needed, CAREIC

caused new securities offerings to be made, initially through CAREIC alone, and then later through the other Debtors that CAREIC caused to be formed. [40] Paragraphs 36 through 39 below provide a brief summary of this pattern.

36. When initially organized in April 2004, CAREIC raised funds from investors for the purposes of acquiring and developing real property primarily located in the Western United States. [41]

37. However, after four separate securities offerings during the period of April 2004 through June 2005 that raised approximately $31 million, additional funding was required because, while property rights had been purchased, the property had not been developed and there was a virtual lack of revenues to fund operations. [42] Thus, CAREIC caused new "Castle Arch" entities to be formed as additional vehicles through which funds could be raised, referred to by the Trustee as the "*Legacy Model*"—a business model involving the Legacy Debtors that focused on acquiring and developing real property. [43]

38. CAREIC caused CAK to be organized in April 2006, and through a $30 million securities offering in May 2006, approximately $10 million was ultimately raised. [44] As cash again diminished, CAREIC caused CAS to be formed in January 2008, and CAS raised a total of approximately $4.5 million through two securities offerings made in June 2007 and February 2008. [45] In January 2008, when cash reserves again began to dip, CAREIC caused CASDF to be organized, and CASDF made a securities offering in February 2008, raising approximately $8.4 million. [46] In April 2008, when funds were again low, CAREIC made a final fifth securities offering, raising approximately $7.1 million. [47]

39. In 2009, after the crash of the real estate market and the financial crisis, which likely made fundraising under the Legacy Model difficult, [48] CAREIC caused the CAOP Debtors to be formed to raise funds for what the Trustee refers to as the "*Distressed Property Model*." Under this business model, funds raised from investors were used to invest in distressed properties or pools of distressed properties through, in many instances, joint ventures with third parties. [49] Fundraising through this Distressed Property Model continued up to the Petition Date, with some investment of these funds being made after the Petition Date. [50]

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)
2013 WL 492369

**D.**

*Fundraising Purpose*

\*7  40. Consistent with the Legacy Model, real properties or rights to purchase real property were obtained by the Legacy Debtors,[51] referred to generally herein as the "*Kingman Property,*" which is real property or options to purchase real property located in Mohave County, Arizona; the "*Tooele Property,*" which is real property and related water rights located in Tooele County, Utah; the "*Smyrna Property,*" which is real property located in Rutherford County, Tennessee; and the "*Star Valley Property,*" which is real property located in Lincoln County, Wyoming.[52]

41. Despite the purchase of these properties and attempted development, a large portion of the Legacy Debtors' business focused on fundraising.[53]

42. In particular, according to the face of the Debtors' books and records as of the Petition Date, of the approximately $73 million that they raised from investors: (a) in excess of $8 million was used for executive compensation and related expenses; and (b) in excess of $10 million was used to pay fundraising expenses, including "finders' fees," commissions and other associated costs.[54] These two expense groupings alone account for approximately 25% of all funds raised by the Debtors from investors since 2004.[55]

43. The Debtors initially raised funds from investors through the sale of securities by non-licensed finders. Eventually, management became concerned about this practice, and it thereafter commenced a time-consuming and expensive search for a FINRA licensed broker-dealer to sell the Debtors' and Castle Arch Affiliates' securities. This resulted in the ill-fated relationship with the "Longview" entities, the costly litigation for which has now been settled.[56]

44. The Debtors' securities sales were also subject to a SEC inquiry in June 2009, which was also time consuming and costly. CAREIC employed counsel to assist it with this investigation, and it shut down virtually all fundraising operations while management focused on responding to the inquiry.[57]

45. Despite spending tens of millions prior to the Petition Date in purchasing and attempting to develop properties, almost all of the real properties that the Legacy Debtors purchased and currently own remained undeveloped, and there are no entitlements currently in place. The only real property that was developed to a point that developed units could be sold as of the Petition Date was the Star Valley Property.[58]

**E.**

*Use of Investor Funds And Payments*

46. The Legacy Debtors had relatively little revenues generated from operations, but rather operating costs (including significant executive compensation and expenses) were funded by monies raised from the sale of securities to investors.[59]

47. CAREIC had several bank accounts in its name prior to the Petition Date.[60]

48. When CAREIC caused a new entity to be formed, it typically caused at least one bank account to be opened in the name of the new entity. Thus, each of the Legacy Debtors had at least one bank account.[61]

\*8  49. From the face of the Debtors' accounting records, it appears that funds obtained from investors in one of the Legacy Debtors were primarily deposited into a bank account held in the name of that Legacy Debtor.[62]

50. However, it was not uncommon for funds obtained from investors in one of the Legacy Debtors to be deposited into a bank account of another one of the Legacy Debtors. When this occurred, the single transaction spawned multiple book entries in the relevant Legacy Debtors' General Ledger accounts, including entries in intercompany receivable and/or intercompany payable accounts of the Legacy Debtors involved.[63]

51. Sometimes, investor money deposited with an incorrect Legacy Debtor was never returned to the Legacy Debtor in which the investment had been made.[64] In the Trustee's example of an instance where a cash investment in CASDF was retained by CAREIC, the deposit of the investor's cash was recorded in a commingled intercompany account on

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

CAREIC's General Ledger and resulted in several journal entries on CASDF's General Ledger reporting the amount as a draw on the purported *Third CAK Loan* " (as defined below).[65] In reality, these funds were retained by CAREIC and no loan or draw was made by CASDF to CAK.[66]

52. Sometimes, money invested with one Legacy Debtor was deposited directly into CAREIC's bank account, but unlike the Trustee's example above, the money was then subsequently transferred by CAREIC to the relevant Legacy Debtor in which the investment had been made.[67] These single transactions resulted in multiple book entries by both CAREIC, the entity that received the investor's money, and the Legacy Debtor who should have received the investor's money, including entries in CAREIC's General Ledger account for "Intercompany Payable," and entries in the General Ledger account for "Intercompany Receivable" of the Legacy Debtor who should have received the investor's money in the first instance.[68]

53. Furthermore, it was not uncommon for one Legacy Debtor's cash to be used to directly pay the expenses of another Legacy Debtor.[69] This occurred in regard to the purchases of real properties and the servicing of debt,[70] and it also occurred in making payments to investors.[71] In the example provided by the Trustee, the source of payments to CASDF investors included not only monies raised by earlier investors in CASDF, but also from cash held by CAREIC and the CAOP Debtors.[72]

54. Also, the Trustee has provided an example of one interest payment made to a CASDF investor to illustrate that certain redemptions and interest payments for CASDF were also being made directly by CAREIC and recorded as an intercompany transaction.[73] In the Trustee's example, the transaction resulted in recorded entries in the General Ledgers of CASDF and CAREIC, as an "Intercompany Payable" by CASDF and as an "Intercompany Receivable" by CAREIC.[74]

55. Intercompany transfers of cash appear to have been recorded in the Legacy Debtors' accounting records by journal entries.[75] Yet, there are thousands of these intercompany and cash entries, often with a single transfer being booked to several accounts, including through commingled "Intercompany" General Ledger accounts which

recorded intercompany receivables and payables of multiple Debtors.[76]

*9 56. Given the number of intercompany transfers and the weaving of these transfers through multiple General Ledger accounts that are often times commingled, significant time and expense would be required to "unscramble" the intercompany transfers and transactions of the Legacy Debtors from the journal entries alone.[77]

57. Also, due to the complexity of the booked entries and the Trustee's opinion that the book entries may not always be accurate or reflect the true nature of the transaction booked, a true and accurate accounting of the respective intercompany claims would require the Trustee to analyze all cash transactions and underlying supporting invoices and documents commencing from 2004 through the time of his appointment.[78]

58. Finally, the Trustee has concluded and it is uncontroverted that, on a whole, the Debtors' cash was used collectively, as if part of one big "piggy bank," with funds from the account of whichever entity had cash on deposit being transferred, commingled, and used by the entity in need of cash at any given time. In other words, entities with cash at the time would fund the cash requirements and needs of the entities without sufficient cash.[79]

59. Accordingly, if the Legacy Debtors were to remain recognized as separate legal entities, it is the Trustee's opinion that to obtain a true and correct account of the respective intercompany claims, he would initially need to independently analyze and trace the numerous intercompany transactions based on a review of booked entries and actual use of cash. Such an investigation would be very expensive and time-consuming and would likely consume a large part of any distribution to parties in interest in this case.[80]

F.

*Commingling Of Assets And Debts*

60. When organized in April 2004, CAREIC intended to purchase and develop real properties. But, because of its virtual lack of revenues and need for new cash to fund operations, CAREIC ultimately caused new entities to be

formed to raise funds.[81] Once these new Legacy Debtors were created, it appears that the intent of pre-petition management was that CAREIC would acquire undeveloped land, or the right to purchase undeveloped land, and then transfer its acquisitions to the separately organized Legacy Debtors for development. However, this is not actually what occurred.[82]

61. Based on the evidence, the Legacy Debtors' affairs would be very difficult to "unscramble" in light of the fact that, in addition to the significant commingling and intercompany transfers of cash discussed above, assets were purchased as part of very convoluted intercompany transactions.[83]

62. If the Legacy Debtors were to remain recognized as separate legal entities, great time and expense, including significant litigation expense, would be required to unwind these real estate transactions, and any attempt to do so and account for the numerous intercompany transfers would, in addition to the required independent cash analysis discussed above,[84] likely consume a large part of any distribution to parties in interest in this case.

*10 63. The Trustee has provided several examples which support the Court's findings and conclusions, discussed in subparagraphs (1) through (3) below.

### (1) The CAK Notes Issued to CASDF

64. The Trustee has provided evidence of three Promissory Notes issued by CAK to CASDF, and the transactions related thereto, to illustrate the tangled nature of the Legacy Debtors' affairs.[85] In many cases, these Promissory Notes and related book entries do not reflect the true nature of the transactions/ loans documented by former management.[86] Each of these Promissory Notes and the related transactions are discussed immediately in subparts (a)-(c)

### (a) The First CAK Note

65. Based on the evidence, including the summary of the transactions set forth in Exhibit H, titled "*CASDF/CAK Loan # 1 ($1,280, 000)/Lingenfelter Option # 2—Kingman Land Purchase (380 Acres)*" (the "*First Loan Chart*") and the documents attached to the First Loan Chart as Exhibits H1

through H20, all of which summarize transactions related to the purchase of 380 acres of the Kingman Property, it appears that: (a) the 380 acres purchased were titled in the name of CAREIC; but, (b) the total purchase price of approximately $9.5 million was financed by a Promissory Note that CAREIC issued to the seller in the principal amount of approximately $8.2 million, with the balance of the purchase price being paid in cash from contributions made by numerous, primarily non-CAREIC sources.[87]

66. The portion of the cash that was contributed for the purchase of the 380 acres, together with other monies transferred by CASDF to CAREIC for operations, form the basis of a Promissory Note dated March 25, 2008 between CAK and CASDF in the principal amount of $1,280,000.00, which states that it is secured by a different parcel of Kingman Property than the 380 acres (the "*First CAK Note*").[88]

67. As to the contribution of cash for CAREIC's purchase of the 380 acres, the evidence shows that: (a) $840,109.00 was transferred directly by CASDF to the title company on or about the date of closing; and (b) the remaining $760,000.00 was paid on or about the date of closing by CAREIC from funds that were deposited into its commingled operating account by other Legacy Debtors, including (i) a transfer of cash from CAREIC's money market account (that likely included commingled Debtor funds as a result of earlier intercompany transfers) to its commingled operating account, (ii) a transfer of cash from CAS, and (iii) a transfer of cash from CAK.[89]

68. The $840,109.00 that was transferred by CASDF for CAREIC's purchase of the 380 acres, plus a series of cash transfers that CASDF made to CAREIC's commingled operating account totaling $440,000.00 and used for CAREIC's operations, are the basis of the $1,280,000.00 principal amount of the First CAK Note that CAK issued to CASDF.[90]

69. Thus, while the First CAK Note purports to document a loan from CASDF to CAK,[91] it in fact represents monies that CASDF transferred to or for the benefit of CAREIC.[92]

*11 70. The March 25, 2008 date on the face of the First CAK Note[93] does not coincide with the fact that CASDF's transfers totaling $440,000.00 actually took place from March

31, 2008 through April 22, 2008, after the First CAK Note was allegedly issued. [94]

71. Finally, adding to the confusion is the fact that, although the First CAK Note is documented as a money purchase secured transaction, the property that the funds were used to purchase—the 380 acres—do not collateralize the First CAK Note. Rather, the First CAK Note states that it is secured by 40.09 acres of Kingman Property that had been purchased in 2007 in CAK's name. [95]

#### (b) The Second CAK Note

72. Transactions related to a second Promissory Note dated July 2, 2008 issued by CAK to CASDF in the principal amount of $3,200,000 .00 (the "Second CAK Note") [96] are summarized on Exhibit I, a chart titled "CASDF/CAK Loan # 2 ($3,200, 000)" (the "Second Loan Chart"). [97] CAREIC's purchase of 120 acres of the Kingman Property allegedly pledged as collateral by CAK for the Second CAK Note is summarized on Exhibit J, a chart titled "CASDF/CAK Loan # 2 ($3,200,000)—Purchase of Property Used to Collateralize Loan" (the "Property Chart"). [98]

73. Based on the evidence summarized in Exhibits I and J, including Exhibits I–1 through I–14 and Exhibits J–1 through J–22, it appears that: (a) the Second CAK Note purports to create an obligation by CAK to CASDF for monies that were transferred as part of a mortgage; but in fact, (b) the monies that were transferred from CASDF's bank accounts were either (i) not transferred to CAK, but directly to CAREIC, or (ii) were transferred to CAK which then transferred them to pay CAREIC's operating expenses or to pay obligations of CAS. [99]

74. The $3.2 million principal amount of the Second CAK Note is based on the following transfers, some of which occurred after the July 2, 2008 date stated on the Second CAK Note: (a) two transfers made in May 2008 from a CASDF account to CAREIC's commingled operating account in the total amount of $750,000.00; (b) one transfer made in August 2008 from a CASDF account in the total amount of $450,000.00 to CAREIC's savings account which was then transferred to CAREIC's commingled operating account; and (c) a transfer of $2 million on July 10, 2008 (after the date of the Second CAK Note) from CASDF to CAK, which CAK then transferred as follows: (i) on July 11, 2008, $1.5 million

was transferred by CAK to CAREIC accounts, which were then used by CAREIC to pay its operational expenses and obligations of CAS purportedly owed to Director William Davidson, (ii) also on July 11th, $400,000.00 was transferred by CAK to Geringer Capital Inc. to pay for loans that such entity purportedly made to CAS, and (iii) later, in October 2008, the remaining $100,000.00 was transferred by CAK to CAREIC's commingled operating account for its operations. [100]

75. Additionally, although the Second CAK Note was issued by CAK, the 120 acres of Kingman Property pledged to CASDF to secure that Note is in fact titled in CAREIC's name. [101] Furthermore, a significant portion of the funds used by CAREIC to purchase at least 120 acres of this Kingman Property was obtained from loan proceeds that CAREIC obtained from other multiple non-CAREIC sources, including third-party lenders who issued loans collateralized by the Tooele Property, rather than by the Kingman Property it was purchasing. [102]

#### (c) The Third CAK Note

*12  76. Numerous transactions resulting in a third Promissory Note dated June 30, 2009 issued by CAK to CASDF in the principal amount of $3,325,893.00 (the "Third CAK Note")are set forth on Exhibit K, a chart titled "CASDF/ CAK Loan # 3 ($3,325,893)" (the "Third Loan Chart"). [103]

77. Based on the Third Loan Chart, as well as Exhibits K–1 through K–20, it appears that (a) the Third CAK Note purports to create an obligation for monies that CASDF transferred to CAK; but in fact, (b) the monies that were transferred from CASDF's bank accounts (i) were not transferred to CAK, but directly from CASDF to CAREIC, (ii) were transferred by CASDF directly to a third party who apparently was owed money by CAS, or (iii) were monies invested by CASDF investors that were directly deposited in CAREIC's operating account. Of the CASDF monies transferred to CAREIC, most were used for CAREIC's operations, and some were used to purchase the water rights associated with the Tooele Property. [104]

78. The Third CAK Note, dated June 30, 2009, in most instances well after all of CASDF's transfers to CAK had been made, appears to have been used to "paper" these earlier transactions. [105]

79. The Third CAK Note claims to be secured by four separate tracks of land, identified on the Third Loan Chart in the boxes marked "A," "B," "C," and "D." While the Third CAK Note was issued to CASDF by CAK, [106] the land purporting to collateralize the Note is, with the exception of 40.56 acres identified in box "C," titled in CAREIC's name. Those 40.56 acres are titled in CAK's name. [107]

80. Although this purported collateral is titled in CAREIC and CAK's name, with the exception of the "Green Land" in CAREIC's name (shown in box "A" of the Third Loan Chart), which was paid for from CAREIC's commingled operating account, [108] the purchases of the *Lingenfelter Option # 2* noted in box "B" of the Third Loan Chart, the *Water Tower Property* noted in box "C" and the 60 acres from the Lingenfelter Option # 1 noted in box "D" of the Third Loan Chart are convoluted and utilized funds from other Legacy Debtors. [109]

81. Exhibit M, a chart titled *"CASDF/CAK Loan # 3 ($3,325,893) (B) Purchase of Lingenfelter Option # 2"* (the "Option Purchase Chart"), and Exhibits M–1 through M–17 attached thereto, summarize CAREIC's acquisition of the Lingenfelter Option # 2, noted in box "B" of the Third Loan Chart. [110] Although titled in CAREIC's name and purportedly pledged by CAK for the Third CAK Loan to CASDF, cash used to purchase the Lingenfelter Option # 2 was obtained as set forth on the Option Purchase Chart, including from monies transferred to CAREIC by CAS and CAK, and the proceeds that CASDF paid directly to the title company as part of the First CAK Note discussed above. [111]

82. Exhibit N, a chart titled *"CASDF/CAK Loan # 3 ($3,325,893) (C) Purchase of Water Tower Property"* (the "Water Tower Chart"), and Exhibits N–1 through N–9 attached thereto, summarize CAK's acquisition of the Water Tower Property, noted in box "C" of the Third Loan Chart. [112] As set forth thereon, although titled in CAK's name and pledged as collateral for the Third CAK Loan to CASDF, cash used to purchase the Water Tower Property appears to have primarily been paid directly from the proceeds of a loan between Robhana, Inc. and CAS, and in part by CAREIC. Thus, it does not appear that CAK contributed much, if any, money for the purchase of the Water Tower Property that was titled in its name. [113]

### *(2) Acquisition of the Smyrna Property*

*13 83. A second example of the tangled affairs of the Legacy Debtors is demonstrated by the purchase of the Smyrna Property, discussed immediately below. [114]

84. As summarized in Exhibit O, a chart titled *"Smyrna, TN—486 Acres ($5,600, 000)"* (the "Smyrna Chart"), and Exhibits O–1 through O–36, which provide the details of the acquisition of certain parcels of the Smyrna Property, [115] although the Smyrna Property is titled in CAS's name, the purchase of this Property involved a complicated series of transfers and monies obtained from a conglomeration of sources, many of which were never even transferred to CAS, but rather were paid directly to the title company by, among others, CAK and CAREIC, or by CAREIC after transfers of cash to it by CAS. [116]

85. Also, a significant portion of the monies used to pay for the purchase of the Smyrna Property came from loans made to CAS from CAREIC Board members Bill Davidson and Robert Geringer, as well as from an entity called *"Robhana, Inc."* (collectively, the "CAS Loans"). [117]

86. With the exception of the CAS Loan to Robhana, Inc., [118] the majority of cash used to repay the CAS Loans was paid directly to the lenders by Legacy Debtors other than CAS. [119] Even in the case of the CAS Loan to Robhana, Inc., CAREIC and CAK contributed cash, not insignificant, to repay the lender, including a payment made by CAREIC directly to Robhana, Inc. [120]

### *(3) Acquisition of Certain Tooele Water Rights*

87. The Trustee also uses the purchase of certain water rights related to the Tooele Property (the "Water Rights")to demonstrate the entangled nature of the Legacy Debtors' affairs. [121]

88. Exhibit S, a chart titled *"Tooele, UT Water Rights —155.93 Acre Feet ($2,353,562)"* (the "Tooele Chart"), which summarizes the acquisition of 155.93 acre feet of approximately 616 total acre feet of Water Rights owned, together with Exhibits S–1 through S–18, which provide the documents used by the Trustee to create the Tooele

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

Chart,[122] demonstrates that although the Water Rights were titled in CAREIC's name, the purchase of these Water Rights involved the collection of funds from numerous sources, including by the other Legacy Debtors, the majority of which were transferred to CAREIC's commingled operating account and paid to the title company handling the purchase transaction.[123]

89. Also, of the total purchase price of approximately $2.3 million, $540,000.00 of the funds used by CAREIC to pay for the Water Rights were sourced from loans that certain individuals, primarily insiders, made to CAREIC (the "*Water Loans*").[124]

90. Although loans to CAREIC, these Water Loans are recorded as notes payable of CAS in its General Ledger.[125] In addition, all of the Water Loans apparently made for CAREIC's purchase of the Water Rights state that they are collateralized by the Water Rights, as well as the Smyrna Property titled in CAS's name.[126]

*14 91. Jeff Austin, a former CAREIC Board member and Officer, made one of the Water Loans in the principal amount of $100,000.00.[127] This loan was accounted for and, ultimately, repaid as follows: (a) Austin's Water Loan to CAREIC for purchase of the Water Rights was recorded as a notes payable in CAS's General Ledger; and (b) the majority of this Water Loan was repaid from funds that CAREIC obtained from a loan it obtained from Saggiani Properties, LLC, which loan states that it is collateralized by a portion of the Smyrna Property owned by CAS.[128]

### G.

### *CASV*

92. CAREIC caused CASV to be organized as a Utah limited liability company in December, 2009, and it was domesticated to do business in the State of Wyoming in January, 2010.[129]

93. CAREIC is the sole member and manager of CASV and at all times controlled CASV.[130]

94. CASV was not an entity that offered securities for sale, and it appears to have had no capital.[131]

95. Rather, CAREIC's funds were deposited in bank accounts held in CASV's name, these CASV accounts were controlled by CAREIC, and the accounts and transactions involving the accounts were listed on CAREIC's General Ledger as if they were its own.[132] Doug Child, CAREIC's Chief Financial Officer and a Board member prior to the Petition Date ("*Child*"), has testified that these bank accounts were established and used by CAREIC after threat of a tax levy, and that the bank accounts in CASV's name were CAREIC's accounts.[133]

96. CASV's only other asset appears to be the Star Valley Property.[134]

97. As summarized on Exhibit U, a chart titled "*Thayne, WU (Star Valley Property)—40 Acres ($800,100)* " (the "*Star Valley Chart*"), as well as Exhibits U–1 through U–18, although CAREIC and, primarily, CAK, provided funds to purchase the Star Valley Property, the seller of the Star Valley Property issued a Warranty Deed to Sierra Construction and Excavation, Inc. in June 2007, which then assigned the Deed to CAREIC.[135] In April 2008, CAREIC executed a Warranty Deed, transferring the Star Valley Property to Child. Concurrent with this transfer in 2008, Child obtained a loan from the Bank of Star Valley, claimed to be secured by the Star Valley Property (the "*Child–BSV Loan*"). In December 2009, CAREIC caused CASV to be organized and Child transferred the Star Valley Property to it by Quit Claim Deed, and CASV guaranteed the Child–BSV Loan.[136]

98. At no time did CASV have any capital to fund the Child–BSV Loan or to pay any other obligations related to the Star Valley Property.[137]

99. CASV did not file a bankruptcy petition.[138]

100. But, CAREIC has listed its 100% interest in CASV and the Star Valley Property as its assets.[139] CAREIC has also listed the Bank of Star Valley and the Lincoln County Treasurer as secured creditors.[140]

101. Also, in its Statement of Financial Affairs, CAREIC lists a Chase account ending in the number 5597 as one of its

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

closed bank accounts, when in fact this was a bank account held in the name of CASV. [141]

*15 102. In CAREIC's Schedules, it states that CASV was "never operated" [142] and Child has testified that CASV was not an operating company. [143]

103. The Bank of Star Valley and the Lincoln County Treasurer have been served with notice of the Consolidation Motion, and they have not objected to the relief sought therein. [144]

104. Based on these facts, CASV and CAREIC were at all times one and the same. Consolidation of CASV is not only necessary to prevent injustice, but given the facts, no creditor can say that it has relied on the separateness of CASV. [145]

105. The Bank of Star Valley and Lincoln County have filed proofs of claim against CAREIC. [146]

### H.

### *Benefit And Other Conclusions*

106. In determining the advantages, disadvantages and equities involved in substantively consolidating the Legacy Debtors, the Trustee and his Court-appointed professionals, at his direction, have reviewed all potential assets known as of this time and all claims that were scheduled by the Legacy Debtors or have been filed, as reflected on the Court's respective claims dockets for each of the Legacy Debtors, that have not been disallowed or re-characterized as equity as of this time. [147]

107. Based on this analysis, as well as all of the facts set forth above, the Trustee has concluded, in an appropriate exercise of his business judgment, that substantive consolidation of the Legacy Debtors is in the best interests of all parties in interest, and in fact is necessary to prevent injustice. [148] This conclusion is supported by the evidence described above and at least for the following reasons:

(a) The Legacy Debtors' assets and affairs are hopelessly commingled;

(b) Cash of the Legacy Debtors was used indiscriminately to fund whichever entity was in need of cash at the time;

(c) The Legacy Debtors were all managed by the same Board of Directors and Officers, and were provided administrative services on a consolidated basis;

(d) CAREIC caused all of the other Legacy Debtors to be formed, and in the case of CAK, CAS and CASDF, they were created by CAREIC as a vehicle by which to obtain additional investor funds;

(e) CASV was treated as if it were CAREIC in CAREIC's books and records, as well as the Statements and Schedules that CAREIC filed in this case;

(f) None of the Legacy Debtors had any corporate existence outside of the CAREIC corporate family;

(g) Based on Private Placement Memoranda issued and other representations to the public, such as filings with the SEC, all of the Legacy Debtors consistently represented themselves as being controlled by CAREIC; and

(h) Certain significant forensic accounting and litigation expense that would be required (plus the potential cost of any separately appointed fiduciaries and their professionals), to "unscramble" the Legacy Debtors, to the extent possible, would greatly threaten any recovery by parties in interest in these cases. [149]

### IV.

### *CONCLUSIONS OF LAW*

### *Authority To Order Substantive Consolidation*

*16 108. Substantive consolidation is an extraordinary remedy, arising out of federal common law for the purpose of advancing the equitable powers of the bankruptcy courts. [150] The result is that "claims of creditors against separate debtors morph to claims against the consolidated survivor." [151]

109. The Court of Appeals for the Tenth Circuit has stated:

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

The power to consolidate authorizes the court to pierce the several corporate veils and to disregard the existence of the separate corporate entities. Thus where a corporation is a mere instrumentality or alter ego of the bankrupt corporation, with no independent existence of its own, equity would favor disregarding the separate corporate entities. It is, of course, proper to disregard a separate legal entity when such action is necessary to avoid fraud or injustice. [152]

110. "The bankruptcy court's power of substantive consolidation has been considered part of the bankruptcy court's general equitable powers since the passage of the Bankruptcy Act of 1898." [153]

111. This power is widely accepted under the Bankruptcy Code, including by this Court. [154]

### *Substantive Consolidation Of The Legacy Debtors Is Appropriate*

112. "The propriety of ordering substantive consolidation is primarily a factual question and is determined by a balancing of interests" of those seeking consolidation and those opposing it, if any. [155]

113. In *Fish v. East,* the Tenth Circuit set forth the following ten factors to consider in a consolidation analysis:

(1) The parent corporation owns all or majority of the stock of the subsidiary;

(2) The parent and subsidiary corporations have common directors or officers;

(3) The parent corporation finances the subsidiary;

(4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;

(5) The subsidiary has grossly inadequate capital;

(6) The parent corporation pays the salaries or expenses or losses of the subsidiary;

(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

(8) In the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division;

(9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and

(10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed. [156]

114. Later, in *Gulfco,* the Tenth Circuit again recognized these "*Fish*" factors for substantive consolidation. [157]

115. More recently, in *In re Horsley,* this Court stated: "The *Gulfco/Fish* criteria can be reduced into two general components: (1) the extent to which the entity to be substantively consolidated was managed or controlled by the debtor, and (2) whether the entity to be substantively consolidated had an economic existence independent from the Debtor." [158]

*17 116. Finally, as recognized by numerous courts, the degree of difficulty and expense involved with segregating and ascertaining individual assets and liabilities of each of the entities is particularly relevant. [159] Thus, substantive consolidation is proper where the assets of the entities in question are "hopelessly commingled," [160] or where difficult accounting problems caused by intercompany debt are "so strong that the great expense (in order to bring about an unscrambling) threaten[s] recovery." [161]

117. Based on this law and its application to the Findings of Fact set forth above, substantive consolidation of the Legacy Debtors is appropriate.

118. Thus, the Legacy Debtors are substantively consolidated.

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

### *Nunc Pro Tunc Consolidation Of CASV*

119. In addition, substantive consolidation of CASV as of the CAREIC Petition Date is appropriate.

120. The Court has considered the test for *nunc pro tunc* consolidation set forth in *In re Auto–Train Corp.*,[162] and concludes that the Trustee has shown that *nunc pro tunc* consolidation of CASV achieves benefit and avoids harm.

121. Furthermore, in accordance with the test for *nunc pro tunc* consolidation in *In re Baker & Getty Fin. Services, Inc.*,[163] such consolidation is appropriate because CAREIC treated CASV as if it were CAREIC, and creditors and parties in interest have dealt with CASV and CAREIC as if they were the same.

122. Accordingly, CASV is substantively consolidated with the other Legacy Debtors as of the CAREIC Petition Date.

Footnotes

1   Docket No. 537.
2   Docket No. 579.Pursuant to the Court's *Order Granting Ex Parte Motion for Leave to File Documents Conventionally,* Docket No. 575, the Trustee filed the Document Declaration electronically, but given their volume, the Exhibits attached to the Document Declaration were filed with the Court conventionally. As stated on the record, Exh. K was amended by the Trustee after it was filed, and the Court admitted amended Exh. K, substituting it for Exh. K attached to the Document Declaration.
3   Docket No. 578.
4   Docket No. 538.
5   Docket No. 544.
6   Docket No. 544, Certificate of Service, Exh. A.
7   Exh. EEE.
8   *See* Trustee Declaration ¶¶ 105–108.
9   Trustee Declaration ¶ 5.
10  Docket No. 58.
11  Exh. DDD (Transcript dated April 26, 2012, p. 8, lns. 13–20).
12  Docket No. 208.
13  Docket No. 215.
14  Trustee Declaration ¶ 1 & Exh. A.
15  Trustee Declaration ¶ 11.
16  Trustee Declaration ¶ 12.
17  Exh. D (Common Units Owned by CAREIC).
18  Trustee Declaration ¶ 14.
19  Trustee Declaration ¶ 15; *see also, e.g.,* Exhs. WW–AAA (Form 10–KSB, Annual Report for the fiscal year ending Dec. 31, 2005, Part III, Item 9; Form 10–KSB, Annual Report of the fiscal year ending Dec. 31, 2006, Part III, Item 9; Form 10–KSB, Annual Report for the fiscal year ending Dec. 2007, Part III, Item 9; Form 10–KSB, Annual Report for the fiscal year ending Dec. 31, 2008, Part III, Item 9).
20  Trustee Declaration ¶ 16; *see also, e.g.,* Exh. BBB (Transcript dated April 19, 2012, p. 172 at lns. 4–10 (testimony of David Hunt that: "No CAREIC subsidiary or affiliated entity ever had any functioning board.... Only one functioning board I knew of in the CAREIC family of companies, and that was CAREIC's board.")).
21  Trustee Declaration ¶ 17; *see also, e.g.* Exh. BBB (Transcript dated April 19, 2012, pp. 244–45 (testimony of Glenn Martinsen that CAREIC affiliates pay CAREIC a management fee for all the services provided to them as "administrative expense" is conducted at the CAREIC level)).
22  Trustee Declaration ¶ 18.
23  *See, e.g.,* Exhs. FFF–JJJ (CAK Private Placement Memorandum dated May 22, 2006; CAS Private Placement Memorandum dated June 25, 2007; CASDF Private Placement Memorandum dated Feb. 1, 2008; CAS Private Placement Memorandum dated Feb. 1, 2008; CAK Private Placement Memorandum dated Sept. 15, 2008); *see also, e.g.,* Exhs. WW–AAA (SEC filings assumed that CAREIC controlled all Legacy Debtors).
24  Exh. HHH (CASDF Private Placement Memorandum dated Feb. 1, 2008, pp. 7, 13–15, 17, 23–29 & 35).

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

25   *Id.,* pp. 7, 21, 23; *see also id.,* p. 20 ("[CASDF] does not have any directors, officers or employees. Rather, all of [CASDF's] operations are performed by our Manager CAREIC's employees, officers and consultants.") & p. 24 (listing CAREIC's many responsibilities and stating: "CAREIC directs our investments into real estate projects, and manages our investment portfolio and our operations.").

26   *Id.* at Exh. "A" (Operating Agreement) at p. 4.

27   *Id.,* pp. 23–24 & Exh "A" (Operating Agreement) at pp. 4–7 (containing comprehensive listing of CAREIC responsibilities).

28   *See generally, id.*

29   Trustee Declaration ¶ 21.

30   Trustee Declaration ¶ 22 & Exhs. WW–AAA (Form 10–KSB, Annual Report for the fiscal year ending Dec. 31, 2005; Form 10–KSB, Annual Report of the fiscal year ending Dec. 31, 2006; Form 10–KSB/A No. 1, dated Dec. 31, 2006; Form 10–KSB, Annual Report for the fiscal year ending Dec. 2007; Form 10–KSB, Annual Report for the fiscal year ending Dec. 31, 2008).

31   Trustee Declaration ¶ 23 & Exhs. MM and RR–VV (General Ledgers and Intercompany Accounts).

32   Trustee Declaration ¶ 24 & Exhs. MM and RR–VV (General Ledgers & Intercompany Accounts).

33   Trustee Declaration ¶ 25.

34   Trustee Declaration ¶ 26.

35   Trustee Declaration ¶ 27 & Exh. EE (Example Of Invoices That Were Not Allocated To Intercompany Accounts On CAREIC General Ledger).

36   Trustee Declaration ¶ 28 & Exh. FF (CAREIC Notes Payable Schedules Including Debt For All Debtors).

37   Trustee Declaration ¶ 30.

38   Trustee Declaration ¶ 30 & Exh. B (Timeline) (showing summary of offerings made and total placements); *see also, e.g.,* Exh. WW (Form 10–KSB, Annual Report for the fiscal year ending December 31, 2005, Part II, Item 6 (zero revenues, operations "funded by capital funding")); Exh. XX (Form 10–KSB, Annual Report of the fiscal year ending December 31, 2006, Part II, Item 6 (net revenues of $48,041 from sale of limited amount of land owned but, "our operations are currently funded by capital funding")); Exh. ZZ (Form 10–KSB, Annual Report for the fiscal year ending December 2007, Part II, Item 6 (zero revenues)); Exh. AAA (Form 10–KSB, Annual Report for the fiscal year ending December 31, 2008, Part II, Item 7 ("We had revenues of $1,980,000 from the sale of raw land, at cost, from our Kingman Arizona raw land holdings.... These revenues were not derived from our primary business target of selling property that we have improved.... Due to our limited revenues or operations are currently funded by capital funding.")).

39   Trustee Declaration ¶ 31, Exh. B (Timeline), Exh. C (Schedule of Net Investor Funds Raised (this number is $73,626,718 in the Debtors' General Ledger)) & Exh. LL (Master Tracking Sheet).

40   As seen on the Cash Charts, the Legacy Debtors primarily engaged in securities offerings from April 2004 through approximately April 2008 in an effort to raise money for the "Legacy Model" of purchasing and developing raw land. Trustee Declaration ¶ 33 n. 23 & Exhs. E–G (Cash Charts). But, with the downturn in the economy and the crash of the real estate market, CAREIC caused the CAOP Debtors to be formed in 2009, *see id.* & Exh. B (Timeline), and commenced its *"Distressed Property Model "* of investing in distressed properties. *Id.*

41   Trustee Declaration ¶ 34, Exh. B (Timeline) & Exh. E (Monthly Investor Funds Raised By Debtor); *see also* Exhs. WW & XX (Form 10–KSB, Annual Reports for the fiscal years ending Dec. 31, 2005 & Dec. 31, 2006, Part I, Item 1 ("We are a residential and commercial land development company with target properties located primarily in the Western United States. Our principal activities are securing acquisition rights to properties, obtaining zoning and other entitlements for the properties, securing financing for the purchase of the properties, improving the properties' infrastructure and amenities, and selling the properties.")).

42   Trustee Declaration ¶ 35, Exh. B (Timeline) & Exhs. E–G (Cash Charts); *see also* Exhs. WW (Form 10–KSB, Annual Report for the fiscal year ending December 31, 2005, Part II, Item 6 (zero revenues, operations "funded by capital funding")) & Exh. XX (Form 10–KSB, Annual Report of the fiscal year ending December 31, 2006, Part II, Item 6 (net revenues of $48,041 from sale of limited amount of land owned, but, "our operations are currently funded by capital funding")).

43   Trustee Declaration ¶ 35, Exh. B (Timeline) & Exhs. E–G (Cash Charts).

44   Trustee Declaration ¶ 36, Exh. B (Timeline) & Exhs. E–G (Cash Charts).

45   *Id.*

46   *Id.*

47   *Id.*

48   CAK made a second Series B securities offering in September 2009 for $15 million, but it only managed to raise approximately $50,000. Trustee Declaration ¶ 37, Exh. B (Timeline) & Exhs. E–G (Cash Charts).

49   *Id.*

50   *Id.*

51   Trustee Declaration ¶ 38.

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

| | |
|---|---|
| 52 | Trustee Declaration ¶ 39. |
| 53 | Trustee Declaration ¶ 40. |
| 54 | Trustee Declaration ¶ 40 & Exh. NN (CAREIC Profit and Loss Statement as of Oct. 16, 2011); *see also* Exhs. OO–QQ (Profit and Loss Statements as of Oct. 16, 2011 for other Legacy Debtors). |
| 55 | Trustee Declaration ¶ 40. |
| 56 | Trustee Declaration ¶ 41; *see* Docket No. 519 (Order approving settlement). |
| 57 | Trustee Declaration ¶ 42. |
| 58 | Trustee Declaration ¶ 43. |
| 59 | Trustee Declaration ¶ 44. |
| 60 | Trustee Declaration ¶ 45. |
| 61 | Trustee Declaration ¶ 46. |
| 62 | Trustee Declaration ¶ 47. |
| 63 | Trustee Declaration ¶ 48; *see also, e.g.,* Exhs. MM (CAREIC Intercompany Accounts) & RR–VV (General Ledgers). |
| 64 | Trustee Declaration ¶ 49 & Exh. V (chart titled "CASDF Investor Money Deposited Into CAREIC Bank Account (Investor Money Never Transferred to CASDF)"). |
| 65 | Trustee Declaration ¶ 49 & Exh. V; *see* discussion *infra* at ¶¶ 76–82 (discussing Third CAK Note). |
| 66 | Trustee Declaration ¶ 49. |
| 67 | Trustee Declaration ¶ 50, Exh. W (chart titled "CASDF Investor Money Deposited Into CAREIC Bank Account (Investor Money Subsequently Transferred to CASDF)"): Exh. X (chart titled "CAK Investor Money Deposited Into CAREIC Bank Account (Investor Money Subsequently Transferred to CAK)") & Exh. Y (chart titled "CAS Investor Money Deposited Into CAREIC Bank Account (Investor Money Subsequently Transferred to CAS)"). |
| 68 | Trustee Declaration ¶ 50. |
| 69 | Trustee Declaration ¶ 51. |
| 70 | *Id.; see also* discussion *infra* at ¶¶ 64–91. |
| 71 | Trustee Declaration ¶ 51; *see also* Exh. C (Schedule of Net Investor Funds Raised (Redemptions/Adjustment) (showing redemptions paid to investors)). |
| 72 | Trustee Declaration ¶ 51, Exh. CC (excerpt of CASDF's General Ledger showing examples of transfers from CAREIC and CAOP Debtors to cover interest payments to CASDF's investors) (Account 10820, dates 06/05/09 ($20,000 by CAREIC); 07/09/09 ($19,866.17 by CAREIC); 08/04/09 ($19687.19 by CAREIC); dated 09/01/09 ($20,000 by CAREIC); 10/02/09 ($20,000 by CAREIC); 11/02/09 ($19,767.19 by CAREIC); 12/03/09 ($22,267.19 by "CAOP"); 12/15/09 (2 payments of $20,000 each by CAOP II); 01/19/10 ($10,000 by unknown Debtor); 02/03/10 ($23,000 by "CAOP"); 03/05/10 ($17,000 by CAREIC))) & Exh. Z (chart titled "CASDF Investor Redemption/Interest Paid By CAREIC"). |
| 73 | Trustee Declaration ¶ 52 & Exh. Z (chart titled "CASDF Investor Redemption/Interest Paid By CAREIC"). |
| 74 | *Id.* The "Intercompany Receivable" account included in the CAREIC General Ledger was a commingled account with activity of other Legacy Debtors. Trustee Declaration ¶ 52, n. 39. |
| 75 | Trustee Declaration ¶ 53. |
| 76 | *Id.,* Exh. M (CAREIC Intercompany Ledger) & Exhs. RR–VV (General Ledgers). |
| 77 | Trustee Declaration ¶ 53. |
| 78 | Trustee Declaration ¶ 54. |
| 79 | Trustee Declaration ¶ 55. |
| 80 | Trustee Declaration ¶ 56. |
| 81 | *See* discussion *supra* at ¶¶ 33–45 (discussing formation and fundraising purpose). |
| 82 | Trustee Declaration ¶ 57. |
| 83 | *See* Trustee Declaration ¶ 58; *see also* discussion *infra* at ¶¶ 64–91 (providing examples of convoluted and commingled intercompany transactions). |
| 84 | *See* discussion *supra* at ¶¶ 56–59 (discussing need for independent cash analysis outside of Debtors' accounting records). |
| 85 | *See* Trustee Declaration ¶¶ 57–78 & Exhs. H–N, including all sub-Exhibits thereto. |
| 86 | *Id.* |
| 87 | Trustee Declaration ¶¶ 60–61 & Exh. H (First Loan Chart), including Exhs. H–1–H–20. |
| 88 | Trustee Declaration ¶ 61 & Exh. H (First Loan Chart), including Exhs. H–10–H–20. |
| 89 | Trustee Declaration ¶ 62 Exh. H (First Loan Chart), including Exhs. H–10–H–13 & H–16–H–20. |

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

| 90 | Trustee Declaration ¶ 63 & Exh. H (First Loan Chart), including H–10–H–13 & H–16–H–20. |
|---|---|
| 91 | *See* Exh. H–15 (First CAK Note). |
| 92 | Trustee Declaration ¶ 64 & Exh. H (First Loan Chart), including H–10–H–13 & H–16–H–20. |
| 93 | *See* Exh. H–15 (First CAK Note). |
| 94 | Trustee Declaration ¶ 65 & Exh. H (First Loan Chart), including Exhs. H–10–H–13 & H–16–H–20. |
| 95 | Trustee Declaration ¶ 65 & Exh. H (First Loan Chart), including Exh. H–14 (First Mortgage). |
| 96 | *See* Exh. I–8 (Second CAK Note). |
| 97 | Trustee Declaration ¶ 66 & Exh. I (Second Loan Chart). |
| 98 | Trustee Declaration ¶ 67 & Exh. J (Property Chart, box marked "A" (describing CAREIC's acquisition of a total of 120 acres of land used as collateral)); *see also* Exh. I (Second Loan Chart, box marked "A" (describing total 120 acres of land used as collateral)). |
| 99 | Trustee Declaration ¶ 68, Exh. I (Second Loan Chart) & Exh. J (Property Chart). |
| 100 | Trustee Declaration ¶ 69, Exh. I (Second Loan Chart) & Exhs. I–1–I–14. |
| 101 | *See* Exh. I (Second Loan Chart, Box marked "A" (describing total 120 acres of land used as collateral)) & Exh. J (Property Chart, Boxes marked "A" (describing CAREIC's acquisition of 120 acres of land used as collateral)). |
| 102 | Trustee Declaration ¶ 70, Exh. I (Second Loan Chart), including Exhs. I–1–I–11, & Exh. J (Property Chart), including Exhs. J–1–J–22. |
| 103 | Trustee Declaration ¶ 71 & Exh. K (Third Loan Chart). |
| 104 | Trustee Declaration ¶ 72, Exh. K (Third Loan Chart) & Exhs. K–1–K–20. |
| 105 | Trustee Declaration ¶ 73, Exh. K (Third Loan Chart) & Exh. K–5 (Third CAK Note). |
| 106 | *See* Exh. K–5 (Third CAK Note). |
| 107 | Trustee Declaration ¶ 74, Exh. K (Third Loan Chart) & Exh. K–1–K–20. |
| 108 | *See* Exh. L (CASDF/CAK Loan # 3 ($3,325,893) (A) Purchase of Green Property Used to Collateralize Loan). |
| 109 | Trustee Declaration ¶ 75. |
| 110 | Trustee Declaration ¶¶ 76–77. |
| 111 | Trustee Declaration ¶ 77, Exh. M (Option Purchase Chart) & Exhs. M–1–M–17. |
| 112 | Trustee Declaration ¶¶ 76 & 78. |
| 113 | Trustee Declaration ¶ 78, Exh. N (Water Tower Chart) & Exhs. N–1–N–9. |
| 114 | Trustee Declaration ¶ 79. |
| 115 | Trustee Declaration ¶ 80. |
| 116 | Trustee Declaration ¶ 81, Exh. O (Smyrna Chart) & Exhs. O–1–O–36. |
| 117 | Trustee Declaration ¶ 82 & Exh. O (Smyrna Chart). |
| 118 | Trustee Declaration ¶ 83, Exh. R (CAS Loan Payments—Robhana, Inc.) & Exh. R–10–R–12. |
| 119 | Trustee Declartion ¶ 83, Exh. P (CAS Loan Payments—Bill Davidson), Exhs. P–1–P–14, Exh. Q (CAS Loan Payments—Robert Geringer) & Exhs. Q–1–Q–14. |
| 120 | Trustee Declaration ¶ 83, Exh. R (CAS Loan Payments—Robhana, Inc. ($1,800,000)) & Exhs. R–1–R–12. |
| 121 | Trustee Declaration ¶ 84. |
| 122 | Trustee Declaration ¶ 85. |
| 123 | Trustee Declaration ¶ 86, Exh. S (Tooele Chart) & Exhs. S–1–S–18. |
| 124 | Trustee Declaration ¶ 87, Exh. S (Tooele Chart), Exh. S–6 (transactions with Kirby Cochran), Exh. S–7 (20% Secured Promissory Note issued by CAREIC to Jeff Austin and accounting records), Exh. S–8 (20% Secured Promissory Note issued by CAREIC to Kimberlee Higa and accounting records), Exh. S–9 (20% Secured Promissory Note issued by CAREIC to Nolan Higa and accounting records), & Exh. S–10 (20% Secured Promissory Note issued by CAREIC to Bill Davidson and accounting records). |
| 125 | Trustee Declaration ¶ 88, Exh. S (Tooele Chart) & Exh. S–11–S–16 (excerpts of CAREIC's General Ledgers and journals, bank records and receipts). |
| 126 | Trustee Declaration ¶ 88, Exh. S (Tooele Chart) & Exhs. S–6–S–10 (promissory notes). |
| 127 | Trustee Declaration ¶ 89, Exh. S (Tooele Chart) & Exh. S–7 (20% Secured Promissory Note issued by CAREIC to Jeff Austin and accounting records). |
| 128 | Trustee Declaration ¶ 89, Exh. S (Tooele Chart), Exh. T (CAREIC Loan Payments—Jeff Austin) & Exhs. T–1–T–7. |
| 129 | Trustee Declaration ¶ 90. |
| 130 | Trustee Declaration ¶ 91. |
| 131 | Trustee Declaration ¶ 92. |

In re Castle Arch Real Estate Inv. Co., LLC, Slip Copy (2013)

2013 WL 492369

132   Trustee Declaration ¶ 93 & Exh. BB (Star Valley Bank Accounts Included in CAREIC General Ledger as of October 16, 2011).

133   Exh. BBB (Transcript dated April 19, 2012, pp. 89–93).

134   Trustee Declaration ¶ 94.

135   Trustee Declaration ¶ 95, Exh. U (Star Valley Chart) & Exhs. U–1–U–18.

136   *Id.*

137   Trustee Declaration ¶ 96.

138   Trustee Declaration ¶ 97.

139   Trustee Declaration ¶ 98 & Exh. HH (CAREIC's Schedules A & B).

140   Trustee Declaration ¶ 98 & Exh. HH (CAREIC's Schedule D).

141   Trustee Declaration ¶ 99 & Exh. HH (CAREIC's Statement of Financial Affairs).

142   Trustee Declaration ¶ 100 & Exh. HH (CAREIC's Schedule B at ¶ 13).

143   Exh. BBB (Transcript dated April 19, 2012, p. 89, lns. 11–15).

144   Trustee Declaration ¶ 101; *see* Notice of Hearing, Docket No. 544, at Certificate of Service, Exh. A.

145   Trustee Declaration ¶ 102.

146   *See* CAREIC Claim Docket, Claim Nos. 23 & 34.

147   Trustee Declaration ¶ 103.

148   Trustee Declaration ¶¶ 2 & 104.

149   Trustee Declaration ¶ 104.

150   *See* 11 U.S.C. § 105(a); *In re Owens Corning, Inc.,* 419 F.3d 195, 205, 208 & 216 (3d Cir.2005); *see also In re George Love Farming, LC,* 366 B.R. 170, 180 (Bankr.D.Utah 2007) (Thurman, J.) (recognizing same).

151   *Owens Corning,* 419 F.3d at 205.

152   *Federal Deposit Ins. Corp. v. Hogan (In re Gulfco Inv. Corp .),* 593 F.2d 921, 928–29 (10th Cir.1979) (relying on *Fish v. East,* 114 F.2d 177, 191 (10th Cir.1940)); *see George Love Farming,* 366 B.R. at 179–80.

153   *Alexander v. Compton (In re Bonham),* 229 F.3d 750, 763 (9th Cir.2000) (citing in part *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219 (1941)).

154   *See, e.g., Owens Corning,* 419 F.3d at 206–209 (discussing history and concluding that although extraordinary, "[n]o court has held that substantive consolidation is not authorized"); *Bonham,* 229 F.3d at 765 (same); *Gulfco Inv. Corp.,* 593 F.2d at 921 (recognizing power); *Fish,* 114 F.2d at 177 (same); *George Love Farming,* 366 B.R. at 180 (same); *see also In re Horsley,* No. 99–30458 JAB, 2001 WL 1682013, at *3 (Bankr.D.Utah Aug. 17, 2001) (Boulden, J.) (stating that the ability to order substantive consolidation was "implied from the bankruptcy court's general equitable powers"); *Heller v. Langenkamp (In re Tureaud),* 59 B.R. 973, 975–77 (N.D.Okla.1986) (affirming order consolidating individual debtor with non-debtor entities controlled by the debtor); *In re Mansfield Corp.,* Bankr.Case No. 02–28236 (Bankr.D.Utah) (Boulden, J.), Order Substantively Consolidating Cases [Docket No. 245].

155   *Matter of Baker & Getty Fin. Servs., Inc.,* 78 B.R. 139, 142 (Bankr.N.D.Ohio 1987); *see In re F.A. Potts & Co.,* 23 B.R. 569 (Bankr.E.D.Pa.1982).

156   *Fish,* 114 F.2d at 191.

157   593 F.2d at 928–29.

158   *In re Horsley,* 2001 WL 1682013, at *4.

159   *See, e.g., Gulfco,* 593 F.2d at 929–30 (recognizing consolidation is appropriate where intercompany debt create difficult accounting problems); *accord In re Introgen Therapeutics, Inc.,* 429 B.R. 570, 582 (Bankr.W.D.Tex.2010) (noting that this is one of the factors in the "traditional test"); *In re Raymond Prof'l Group,* 421 B.R. 891, 913 (Bankr.N.D.Ill.2009); *In re BLI Farms,* 312 B.R. 606, 621 (E.D.Mich.2004); *In re Donut Queen,* 41 B.R. 706, 709 (Bankr.E.D.N.Y.1984) (citing *In re Vecco Constr. Indus., Inc.,* 4 B.R. 407, 410 (Bankr.E.D.Va.1980)).

160   *Gulfco,* 593 F.2d at 928 (discussing *Fish* ).

161   *Id.* at 930.

162   810 F.2d 270 (D.C.Cir.1987).

163   974 F.2d 712 (6th Cir.1992).

# EXHIBIT C

David E. Leta (USB #1937)
Andrew V. Hardenbrook (Arizona Bar # 025518)
*Pro hac vice application pending*
**SNELL & WILMER L.L.P.**
15 W. South Temple, Suite 1200
Salt Lake City, UT 84101
Telephone: (801) 257-1900
Facsimile:  (801) 257-1800
Email: dleta@swlaw.com

*Counsel for Federal Resources Corporation*
*and proposed counsel for Camp Bird Colorado, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **FEDERAL RESOURCES CORPORATION,**  Debtor. | Bankruptcy Case No. 14-33427  (Chapter 11)  Judge Joel T. Marker |

## ORDER GRANTING MOTION FOR SUBSTANTIVE CONSOLIDATION OF DEBTORS' BANKRUPTCY ESTATES

Upon consideration of that certain "Motion for Substantive Consolidation of Debtors' Bankruptcy Estates" ("**Motion**") filed by Federal Resources Corporation and Camp Bird Colorado, Inc. (collectively, the "**Debtors**"), Docket No. 36,  in which the Debtors seek entry of an order substantively consolidating their respective bankruptcy estates for all purposes under Case No. 14-33427, and good cause appearing therefor, the Court:

20851296

FINDS and CONCLUDES that:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334;

B.      Due and proper notice of the Motion has been given; no other or further notice need be provided;

C.      The standards for substantive consolidation set forth in *Matter of Gulfco Inv. Corp.*, 593 F.2d 921, 928 (10th Cir. 1979) are satisfied with respect to Federal Resource Corporation ("**Federal**") and Camp Bird Colorado, Inc. ("**Camp Bird**"); and

D.      Pursuant to 11 U.S.C. § 105(a), good cause exists to grant the Motion.

Accordingly, it is hereby

**ORDERED that:**

1.      The Motion is GRANTED;

2.      Camp Bird shall be, and hereby is, substantively consolidated into Federal, with Federal being the surviving entity, provided, however, that all liens and encumbrances against the assets of Federal and Camp Bird shall survive the consolidation and shall have the same status that such liens and encumbrances had as of the Petition Dates of both Federal and Camp Bird.  The remaining bankruptcy estate shall be Federal, and the remaining bankruptcy case shall be Case No. 14-33427;

3.      Any and all claims asserted by creditors against any or all of the Debtors shall constitute claims asserted against Federal.  Any proof of claim filed against any of the Debtors shall constitute a proof of claim filed against the consolidated estate of Federal, without the necessity of any further action or order of the Court;

4.      Nothing in this Order resolves or addresses in any way whether or not any claim or lien asserted by any creditor constitutes an allowed claim or valid lien;

5.      All future pleadings, papers, and other documents shall be captioned under one consolidated caption and shall be filed and docketed in Case No. 14-33427.  Documents filed in the substantively consolidated cases shall conform to the case caption set forth in the attached **Exhibit 1**, which is authorized for use in these substantively consolidated cases;

6.      From and after the date of this Order, one file and docket shall be maintained for Debtors' substantively consolidated cases under Case No. 14-33427;

7.      Nothing in this Order impacts or affects any appeal by the Debtors of the Idaho Court's Final Judgment in the Idaho Lawsuit (as those terms are defined in the Motion), or otherwise prejudices any argument that the Debtors may make on appeal of the Final Judgment; and

8.      This Order shall take effect immediately.

9.      Federal shall provide notice of this order to all creditors and equity holders.

END OF ORDER

## DESIGNATION OF PARTIES TO BE SERVED

Service of the foregoing **ORDER GRANTING MOTION FOR SUBSTANTIVE CONSOLIDATION OF DEBTORS' BANKRUPTCY ESTATES** shall be served to the parties and in the manner designated below:

**Electronic Service (CM/ECF):** I certify that the parties of record in this case, as identified below, are listed as registered CM/ECF users and will be served through the CM/ECF system:

- James Vincent Cameron tr Vince.Cameron@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- David Dain David.Dain@usdoj.gov, katherine.tribbett@usdoj.gov
- Andrew V. Hardenbrook ahardenbrook@swlaw.com, jpollard@swlaw.com;docket_slc@swlaw.com
- Peter J. Kuhn tr Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- David E. Leta dleta@swlaw.com, wsmart@swlaw.com;btaylor@swlaw.com
- John B. Lyman john.lyman@usdoj.gov, Katherine.Tribbett@usdoj.gov
- Daniel D. Price daniel.price2@usdoj.gov, emily.goodman@usdoj.gov
- United States Trustee USTPRegion19.SK.ECF@usdoj.gov

/s/ _____

**EXHIBIT 1**

# IN THE UNITED STATES BANKRUPTCY COURT

# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **FEDERAL RESOURCES CORPORATION** and **CAMP BIRD COLORADO, INC.,**<br><br>Substantively Consolidated Debtors-in-Possession. | Substantively Consolidated under Bankruptcy Case No. 14-33427<br><br>(Chapter 11)<br>Judge Joel T. Marker<br><br>**THIS DOCUMENT RELATES TO:**<br><br>☐   Both Debtors |

20851296

6